### UNITED STATES v. HUGG.

#### Civil Action No. 2625.

District Court, E. D. Pennsylvania.
July 23, 1943.

Gerald A. Gleeson, U. S. Dist. Atty., and Thomas J. Curtin, Asst. U. S. Dist. Atty., both of Philadelphia, Pa., and Earl R. Larson, Sp. Asst. to Atty. Gen., for plaintiff.

T. Henry Walnut and Francis Fisher Kane, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a proceeding for denaturalization on the ground that the certificate was fraudulently obtained.

The defendant came to this country in 1924 and was naturalized September 4, 1936.

The Government's case against him is based principally upon things he said rather than upon anything he did. There is no evidence that he has ever been engaged in any subversive activities. He was not a member of the Bund. He was at one time a radio salesman and his ownership of a shortwave receiving set on which he sometimes received shortwave broadcasts from Germany as well as from most other foreign countries was not shown to have had any sinister implication. The same may be said of his receipt of German magazines and various pieces of literature, much of which was Nazi propaganda. His reading covered a wide field and he showed particular interest in the philosophy of history. The special agent who searched his house testified that he "had a substantial library at his

home * * * and a number of pamphlets and magazines in addition to those that you (he) took * * * and quantities of music." In March and April of 1941 the defendant bought $2,000 worth of what were known as Rueckwanderer Marks—a type of mark which could be obtained at a very favorable rate of exchange but which required a declaration of intention on the part of the purchaser to live permanently in Germany and which could not be spent in Germany except by a permanent resident. However, when taken in connection with his account and explanation of the transaction, the purchase of these marks does not furnish convincing evidence that in 1941 he had the intention of making his permanent residence in Germany.

He is now and has been for ten years or more a skilled mechanic and for the last three years has been engaged in tool-making for government defense industries. There is not the slightest evidence that his work was not faithfully and accurately done. In fact, there was undisputed evidence that it was. There was one occasion on which he could, without blame falling upon him, have spoiled a job by following incorrect specifications, instead of which he called his foreman's attention to the error.

There was a great deal of evidence as to utterances on his part indicating (or alleged to indicate) disloyal and un-American sentiments and attachment to the government of Germany, from which the conclusion is urged upon the Court that when he took the oath of allegiance he fraudulently mentally reserved his allegiance in whole or in part to the German Reich. These statements were offered not to characterize otherwise ambiguous conduct but as direct evidence of the fraud. Whether they constitute the "clear, unequivocal, and convincing" evidence required by Schneiderman v. United States, 63 S.Ct. 1333, 1341, 87 L. Ed. ——, is the question for this Court to determine.

The testimony comes almost entirely from fellow workmen at the Brown Instrument Company where the defendant was employed from 1924 to 1930 and again from 1936 to 1943, with an interruption of about six months in 1938. Many of the statements imputed to him he denied having made. Others he contends were misunderstood. However, even so the fact remains that he did say a number of things over a period of time which were certainly not consistent with a whole-hearted and loyal support of this Government as it moved into conflict with Germany. I shall not attempt to find the exact words used by the defendant upon the various occasions testified to, nor shall I endeavor to assess the precise meaning which he intended to convey by each remark. In order to place the correct value upon these statements, taken as a whole, as evidence of what was in his mind when he took the oath of allegiance several years earlier, they must be considered with some knowledge of the type of man he is and the background in which they were uttered.

The defendant, as could easily be observed, is high-strung, emotional and very articulate. He is quite well read and intelligent—but not intelligent enough to realize that it was unwise for a man in his position to attempt to defend the German program, even at a time long before this country was actually engaged in the conflict.

Most of the statements charged against the defendant were made not only before this country entered the war but at a time when a large body of public opinion undoubtedly held that it was a purely European conflict which we would be able to avoid. The defendant certainly believed our entry into it would be a great calamity and would end in disaster.

The men who testified against him were, I think quite truthful and sincere. They were mostly of German extraction. None of them, with one possible exception, showed any ill will toward him. They liked to discuss and argue about public affairs while at work and at lunch hour. The defendant's counsel very properly pointed out that it was exactly "the kind of debating society that lies at the root of intelligent democratic action." The defendant, except in his antisemitic sentiments, usually found himself a minority of one, and the men undoubtedly enjoyed baiting him (or "needling" him, as some witnesses put it). Sometimes the arguments became heated and it is plain that the defendant is the kind of person who might easily be driven to say a good many things which he might not have said under other circumstances. There are few people who do not say more than they really mean when a discussion becomes acrimonious. He testified: "But some of these fellows, they couldn't understand my attitude; when I discussed a pure academic subject, they took it for a political—or tried to misread it, and, of course, I am a human

being. I have my weaknesses; I fall; I make mistakes; perhaps more than my share; but I never said anything against the United States, or anything against the interest of this Country."

Probably the most damaging statement testified to was one to the effect that he would rather renounce his citizenship than condemn his mother country, or "anything that he had to do against his mother country, count him out." One witness testified that it occurred in 1941, another, in 1942 (Whether they were referring to the same or different occasions is not entirely clear). The defendant denied having said it. His version of the conversation is: "George Miller, he came over and said, 'The damn Germans are the most hated people in the World.' Now, I say, 'My father and my mother were respected people, and I wouldn't spit in their faces,' and that was before, that was before Pearl Harbor, and I said 'I wouldn't do it now, if I had to give up my citizenship. No fine and honorable American would ask me such a question. * * * It was some misunderstanding, little petty jealousies, and after Pearl Harbor I said, 'Fellows, forget all these little trifles. We have a big job on our hands. You people probably will realize how big a job we have on our hands.' I did not want to see America and my Mother Country at war." It was not disputed that he made the statements last quoted.

He had visited Germany in 1933. That was the year in which Hitler came to power and before the Nazi program had got into full swing. He came back with praise for Hitler and his labor laws. He expressed dissatisfaction with the corresponding legislation in this country although, as one of the witnesses testified, he did not express any preference for the German form of government over this government but considered it "equally as good as ours." At any rate, by the time war threatened in Europe he had pretty well committed himself to upholding the German side of the arguments in the plant. After it broke out, these arguments naturally centered about it and became sharper and the defendant continued to take the German side. He showed elation over the German victories over the British and French. He took the position that we were being misled by propaganda, much of which he attributed to the Jews. He condemned our policy and coarsely abused the President in language which can only be thought of with indignation, but for which the law does not impose the penalty of denaturalization. The vehemence of his arguments appears to have tapered off after this country became a belligerent, although, even then, he made one or two remarks which indicated his belief in the efficacy of the German submarines and slightingly criticised some of our troops as military units.

■ These things might well raise doubts in anyone's mind, whether the defendant, when he took the oath of citizenship really gave up all loyalty to Germany. This, however, is not sufficient. The evidence does not meet the standard set by the Supreme Court in the Schneiderman case. It is not clear, unequivocal and convincing.

There are the strongest reasons why the rule laid down by the Supreme Court should be faithfully adhered to by the trial judge and the prescribed measure of proof strictly required. Perhaps they are stated in Judge Rutledge's concurring opinion better than anywhere else. He said: "It may be doubted that the framers of the Constitution intended to create two classes of citizens, one free and independent, one haltered with a lifetime string tied to its status." And again, a naturalized citizen "could not open his mouth without fear his words would be held against him * * * Such a citizen would not be admitted to liberty. His best course would be silence or hypocrisy. This is not citizenship. * * *"

■ Once a man is admitted to citizenship he must be accorded exactly the same rights as every other citizen of the United States. Otherwise the process of naturalization itself becomes a fraud. These rights include the right of free speech and the right to criticise our Government and to disagree with and oppose its policies. They include the right to read about and to study any forms of political or social activity anywhere in the world and to form opinions upon them. Undoubtedly the right and the duty to denaturalize on the grounds of fraud and illegality is established by law, and such proceedings are often necessary and salutory. But it is none the less disturbing when one stops to consider how close such cases, with their discussions of ideologies and searching inquiries concerning a citizen's support of this or that political theory or international program, can come to the political trials of European

400

countries.* It seems to me that the thought which underlies the attitude of the Supreme Court in the Schneiderman case makes a rigid adherence to the rules laid down in that case a prime duty.

 Resolving, as I must under the rule of that case, such doubts as I have in favor of the citizen, I accept his testimony as true that he did not, when he took the oath, mentally reserve allegiance to Germany, and I so find.

---

*In another denaturalization case recently tried in this Court a German woman of moderate education was extensively questioned as to her views upon (1) government censorship of news, (2) justification for the Austrian Anschluss and (3) the necessity for dismemberment of Germany in order to establish permanent peace.