BAUMGARTNER *v.* UNITED STATES.

No. 493.   Argued April 26, 1944.—Decided June 12, 1944.

*Mr. Harold Evans* for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark,* and *Messrs. Robert S. Erdahl* and *D. E. Balch* were on the brief, for the United States.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On September 26, 1932, the United States District Court for the Western District of Missouri entered its

order admitting Baumgartner to citizenship and issued a certificate of naturalization to him. Almost ten years later, on August 21, 1942, the United States brought this suit under § 338 of the Nationality Act of 1940 (54 Stat. 1137, 1158, 8 U. S. C. § 738) to set aside the naturalization decree and cancel the certificate.[1] The District Court entered a decree for the Government, 47 F. Supp. 622, which the Circuit Court of Appeals for the Eighth Circuit, with one judge dissenting, affirmed. 138 F. 2d 29. We brought the case here because it raises important issues in the proper administration of the law affecting naturalized citizens. 321 U. S. 756.

As a condition to receiving his American citizenship, Baumgartner, like every other alien applying for that great gift, was required to declare on oath that he renounced his former allegiance, in this case to the German Reich, and that he would "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic," and that he would "bear true faith and allegiance to the same." That he did not truly and fully renounce his allegiance to Germany and that he did not in fact intend to support the Constitution and laws of the United States and to give them true faith and allegiance, are the charges of fraud and illegality on which his citizenship is claimed forfeit.

As is true of the determination of all issues of falsity and fraud, the case depends on its own particular facts. But the division of opinion among the judges below makes manifest that facts do not assess themselves and that the

---

[1] Section 338 (a) provides: "It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings . . . for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured."

decisive element is the attitude appropriate for judgment of the facts in a case like this. The two lower courts have sustained the Government's claim that expressions by Baumgartner, in conversations with others and in the soliloquies of a diary, showed that he consciously withheld complete renunciation of his allegiance to Germany and entertained reservations in his oath of allegiance to this country, its Constitution and its laws. What follows is a fair summary of the evidence on which this finding rests, putting the Government's case in its most favorable light.

Baumgartner was born in Kiel, Germany, on January 20, 1895, and brought up in modestly comfortable circumstances. He received a classical high-school education, which he completed in time to enter the German army in 1914. He was commissioned a second lieutenant in 1917, and shortly thereafter he was captured by the British and confined in England until November, 1919. Upon his return to Germany, Baumgartner studied at the University of Darmstadt, from which he was graduated in 1925 as an electrical engineer. Thereupon he was employed by a public utility company until January, 1927, when he left for the United States. Shortly before, Baumgartner had married, and his wife followed him to this country later in the same year.

For about three months, Baumgartner stayed with friends in Illinois, and then came to Kansas City, Missouri, where he was employed by the Kansas City Power and Light Company. He continued in its employ down to the time of this suit. The man to whom he reported to work testified that after about two days on the job, Baumgartner began to discuss the political scene in Germany, to express a lack of enthusiasm for the then German Government, and to extol the virtues of Hitler and his movement. Baumgartner spoke so persistently about the superiority of German people, the German schools, and

the engineering work of the Germans, that he aroused antagonism among his co-workers and was transferred to a different section of the plant.

There was testimony that in 1933 or 1934 Mrs. Baumgartner's mother visited this country, and that after this visit, Baumgartner, beginning in 1934, "praised the work that Hitler was doing over there in bringing Germany back, on repeated occasions." Evidence of statements made by Baumgartner over a period of about seven years beginning in 1933 indicated oft-repeated admiration for the Nazi Government, comparisons between President Roosevelt and Adolf Hitler which led to conclusions that this country would be better off if run as Hitler ran Germany, "that regimentation, as the Nazis, formed it [sic] was superior to the democracy," and that "the democracy of the United States was a practical farce." One witness of German extraction testified that Baumgartner told him he was "a traitor to my country" because of the witness's condemnation of Hitler. Baumgartner made public speeches on at least three occasions before businessmen's groups, clubs, and the like, in which he told of the accomplishments of the Nazi Government and indicated that "he would be glad to live under the regime of Hitler."

During 1937 and 1938, Baumgartner conducted a Sunday school class, and former students testified that the discussion in class turned to Germany very frequently, that Baumgartner indicated that his students could get a fairer picture of conditions in Germany from the German radio, and that Germany was justified in much of what it was doing. The school superintendent also testified that he had received complaints that Baumgartner was preaching Nazism.

In 1938 Baumgartner resigned from the Country Club Congregational Church in Kansas City because he objected to the injection of politics into the sermons. In

May of the next year his wife and their three children, who had been born in Kansas City, went to Germany to visit Mrs. Baumgartner's parents. One witness testified that Baumgartner explained this trip in part by saying that "he wanted the children to be brought up in German schools," and when war broke out in September, 1939, Mrs. Baumgartner cabled for money to return but Baumgartner could not raise the necessary funds and felt that his family would be as safe in Germany as here. Baumgartner remarked that he wanted his wife to come back from Germany, when she did, on a German boat. One of Baumgartner's neighbors testified that in a conversation in December, 1939, Baumgartner, asked about his thirteen-year-old daughter then in Germany, said sarcastically: "Edith has done a very un-American thing, she has joined the Nazi Youth Movement."

There was testimony that Baumgartner justified the German invasions in the late 1930's, and announced, when Dunkerque fell, that "Today I am rejoicing." One witness testified that Baumgartner told him that he "belonged to an order called the so-called 'Bund'," and the diary which Baumgartner kept from December 1, 1938, to the summer of 1941 reveals that he attended a meeting of the German Vocational League where the German national anthem was sung and "everyone naturally arose and assumed the usual German stance with the arm extended to give the National Socialist greeting." Other diary entries reflect violent anti-Semitism, impatience at the lack of pro-German militancy of German-Americans, and approval of Germans who have not "been Americanized, that is, ruined." [2] Finally, Baumgartner replied in the

---

[2] The following are some excerpts from Baumgartner's diary: "The only ones who have any ideas here are the Jews and their ideas are vile, mean, and malicious. . . . Today the President of the United States delivered his message to the new Congress. The speech was a horrible mixture of war agitation and laughable talk about

affirmative to the trial judge's question: "was your attitude towards the principles of the American government in 1932 when you took the oath the same as it has been ever since?"

That the concurrent findings of two lower courts are persuasive proof in support of their judgments is a rule of wisdom in judicial administration. In reaffirming its importance we mean to pay more than lip service. But the rule does not relieve us of the task of examining the foundation for findings in a particular case. The measure of proof requisite to denaturalize a citizen was before this Court in *Schneiderman* v. *United States,* 320 U. S. 118. It was there held that proof to bring about a loss of citizenship must be clear and unequivocal. We cannot escape the conviction that the case made out by the Government lacks that solidity of proof which leaves no troubling doubt in deciding a question of such gravity as is implied in an attempt to reduce a person to the status of alien from that of citizen.

The phrase "finding of fact" may be a summary characterization of complicated factors of varying significance for judgment. Such a "finding of fact" may be the ultimate judgment on a mass of details involving not merely an assessment of the trustworthiness of witnesses but other appropriate inferences that may be drawn from living testimony which elude print. The conclusiveness

the freedom of press, speech, etc., which this country allegedly has and which has to be protected with guns. . . . we drank a bottle of Pschorr brew together to the welfare and the future of Germany. . . . The Jewish-American-English fortress in the heart of Central Europe has fallen. A terrible defeat for the above named powers who will probably have a difficult time recovering from this. . . . Listened to Hitler's speech from the Krolls Opera House on 15.2. It was wonderful as usual. . . . The whole country is under the influence of the insane actions of the Government in Washington which have the character of wild, unbridled despotism."

of a "finding of fact" depends on the nature of the materials on which the finding is based. The finding even of a so-called "subsidiary fact" may be a more or less difficult process varying according to the simplicity or subtlety of the type of "fact" in controversy. Finding so-called ultimate "facts" more clearly implies the application of standards of law. And so the "finding of fact" even if made by two courts may go beyond the determination that should not be set aside here. Though labeled "finding of fact," it may involve the very basis on which judgment of fallible evidence is to be made. Thus, the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of "fact" that precludes consideration by this Court. See, *e. g., Beyer* v. *LeFevre,* 186 U. S. 114. Particularly is this so where a decision here for review cannot escape broadly social judgments—judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship. Deference properly due to the findings of a lower court does not preclude the review here of such judgments. This recognized scope of appellate review is usually differentiated from review of ordinary questions of fact by being called review of a question of law, but that is often not an illuminating test and is never self-executing. Suffice it to say that emphasis on the importance of "clear, unequivocal, and convincing" proof, see *Schneiderman* v. *United States, supra,* at 125, on which to rest the cancellation of a certificate of naturalization would be lost if the ascertainment by the lower courts whether that exacting standard of proof had been satisfied on the whole record were to be deemed a "fact" of the same order as all other "facts," not open to review here.

The gravamen of the Government's complaint and of the findings and opinions below is that Baumgartner con-

sciously withheld allegiance to the United States and its Constitution and laws; in short, that Baumgartner was guilty of fraud. To prove such intentional misrepresentation evidence calculated to establish only the objective falsity of Baumgartner's oath was adduced. Nothing else was offered to show that Baumgartner was aware of a conflict between his views and the new political allegiance he assumed. But even if objective falsity as against perjurious falsity of the oath is to be deemed sufficient under § 338 (a) of the Nationality Act of 1940 to revoke an admission to citizenship, it is our view that the evidence does not measure up to the standard of proof which must be applied to this case.

We come then to a consideration of the evidence in the context in which that evidence is to be judged. Congress alone has been entrusted by the Constitution with the power to give or withhold naturalization and to that end "to establish a uniform Rule of Naturalization." Art. I, § 8, Clause 4. In exercising its power, Congress has authorized the courts to grant American citizenship only if the alien has satisfied the conditions imposed by Congress for naturalization. There is no "right to naturalization unless all statutory requirements are complied with." *United States* v. *Ginsberg,* 243 U. S. 472, 475. And so "If a certificate is procured when the prescribed qualifications have no existence in fact, it may be cancelled by suit." *Tutun* v. *United States,* 270 U. S. 568, 578. From the earliest days of the Republic, Congress has required as a condition of citizenship that the alien renounce his foreign allegiance and swear allegiance to this country and its Constitution. Act of January 29, 1795, 1 Stat. 414. By this requirement Congress has not used meaningless words. Nor, on the other hand, has it thereby expressed a narrow test or formula susceptible of almost mechanical proof, as is true of other prerequisites for

naturalization—period of residence, documentation of arrival, requisite number of sponsoring witnesses and the like. Allegiance to this Government and its laws, is a compendious phrase to describe those political and legal institutions that are the enduring features of American political society. We are here dealing with a test expressing a broad conception—a breadth appropriate to the nature of the subject matter, being nothing less than the bonds that tie Americans together in devotion to a common fealty. The spacious scope of this conception was expressed by this Court in stating that the Constitution "was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues," *Hurtado* v. *California*, 110 U. S. 516, 530–31, and again, "when we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago." *Missouri* v. *Holland*, 252 U. S. 416, 433.

To ascertain fulfilment of a test implying so expansive a reach presents difficult and doubtful problems even for judges presumably well-trained in the meaning of our country's institutions and their demands from its citizens. "Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency." *Luria* v. *United States*, 231 U. S. 9, 22. One of the prerogatives of

American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation. Our trust in the good sense of the people on deliberate reflection goes deep. For such is the contradictoriness of the human mind that the expression of views which may collide with cherished American ideals does not necessarily prove want of devotion to the Nation. It would be foolish to deny that even blatant intolerance toward some of the presuppositions of the democratic faith may not imply rooted disbelief in our system of government.

Forswearing past political allegiance without reservation and full assumption of the obligations of American citizenship are not at all inconsistent with cultural feelings imbedded in childhood and youth.[3] And during a period when new strength of the land of one's nativity was flamboyantly exploited before its full sinister meaning had been adequately revealed even to some Americans of the oldest lineage, such old cultural loyalty, it is well

---

[3] The retention of cultural ties despite the change in "juridical and political" status has thus been put by a distinguished historian, Gaetano Salvemini, in speaking of his own naturalization: "There is in this country a wider area of generosity than in any other country—at least in Europe. It is this feeling that one is at home here that conquers you little by little. And one fine day you feel that you are no longer an exile but a citizen in your own country. When I took my oath I felt that really I was performing a grand function. I was throwing away not my intellectual and moral but my juristic past. I threw it away without any regret. The Ethiopian war, the rape of Albania, the Spanish crime, and this last idiotic crime, had really broken my connection with sovereigns, potentates, and all those ugly things which are enumerated in the formula of the oath. It is a wonderful formula. Your pledges are only juridical and political. You are asked to sever your connections with the government of your former country, not with the people and the civilization of your former country. And you are asked to give allegiance to the Constitution of your adopted country, that is, to an ideal of life." Radcliffe Quarterly, August 1941, pp. 8–9.

known, was stimulated into confusion of mind and sometimes to expressions of offensive exuberance.

The denial of application for citizenship because the judicial mind has not been satisfied that the test of allegiance has been met, presents a problem very different from the revocation of the naturalization certificate once admission to the community of American citizenship has been decreed. No doubt the statutory procedure for naturalization (§ 334, Nationality Act of 1940), and § 338, with which we are here concerned, "were designed to afford cumulative protection against fraudulent or illegal naturalization." *United States* v. *Ness,* 245 U. S. 319, 327. But relaxation in the vigor appropriate for scrutinizing the intensity of the allegiance to this country embraced by an applicant before admitting him to citizenship is not to be corrected by meagre standards for disproving such allegiance retrospectively. New relations and new interests flow, once citizenship has been granted. All that should not be undone unless the proof is compelling that that which was granted was obtained in defiance of Congressional authority. Non-fulfilment of specific conditions, like time of residence or the required number of supporting witnesses, are easily established, and when established leave no room for discretion because Congress has left no area of discretion. But where the claim of "illegality" really involves issues of belief or fraud, proof is treacherous and objective judgment, even by the most disciplined minds, precarious. That is why denaturalization on this score calls for weighty proof, especially when the proof of a false or fraudulent oath rests predominantly not upon contemporaneous evidence but is established by later expressions of opinion argumentatively projected, and often through the distorting and self-deluding medium of memory, to an earlier year when qualifications for citizenship were claimed, tested and adjudicated.

It is idle to try to capture and confine the spirit of this requirement of proof within any fixed form of words. The exercise of our judgment is of course not at large. We are fully mindful that due observance of the law governing the grant of citizenship to aliens touches the very well-being of the Nation. Nothing that we are now deciding is intended to weaken in the slightest the alertness with which admission to American citizenship should be safeguarded. But we must be equally watchful that citizenship once bestowed should not be in jeopardy nor in fear of exercising its American freedom through a too easy finding that citizenship was disloyally acquired. We have sufficiently indicated the considerations of policy, derived from the traditions of our people, that require solid proof that citizenship was falsely and fraudulently procured. These considerations must guide our judicial judgment. Nor can the duty of exercising a judgment be evaded by the illusory definiteness of any formula.

The insufficiency of the evidence to show that Baumgartner did not renounce his allegiance to Germany in 1932 need not be labored. Whatever German political leanings Baumgartner had in 1932, they were to Hitler and Hitlerism, certainly not to the Weimar Republic. Hitler did not come to power until after Baumgartner forswore his allegiance to the then German nation.

Views attributed to Baumgartner as to the superiority of German people, schools, engineering techniques, and the virtues of Hitler, expressed in 1927, when he began to work in Kansas City, are the only direct evidence introduced to show that before he was naturalized in 1932, his attitude precluded his truly or honestly taking an oath of allegiance to the United States, its Constitution and its laws. And his statement at the trial that his attitude toward the principles of the American Government was the same in 1932 as it was at the time of the trial, is hardly significant. For Baumgartner professed

loyalty at the trial, denied or explained the few disturbing statements attributed to him by others, and reconciled suspicious diary entries in ways that do not preclude the validity of his oath of allegiance. In short, the weakness of the proof as to Baumgartner's state of mind at the time he took the oath of allegiance can be removed, if at all, only by a presumption that disqualifying views expressed after naturalization were accurate representations of his views when he took the oath. The logical validity of such a presumption is at best dubious even were the supporting evidence less rhetorical and more conclusive. Baumgartner was certainly not shown to have been a party Nazi, and there is only the statement of one witness that Baumgartner had told him that he was a member of the Bund, to hint even remotely that Baumgartner was associated with any group for the systematic agitation of Nazi views or views hostile to this Government. On the contrary, Baumgartner's diary, on which the Government mainly relies, reveals that when in 1939 he attended a meeting of the German Vocational League at which the Nazi salute was given, it was apparently his only experience with this group, and he went "Since I wanted to see what sort of an organization this Vocational League was."

And so we conclude that the evidence as to Baumgartner's attitude after 1932 affords insufficient proof that in 1932 he had knowing reservations in forswearing his allegiance to the Weimar Republic and embracing allegiance to this country so as to warrant the infliction of the grave consequences involved in making an alien out of a man ten years after he was admitted to citizenship. The evidence in the record before us is not sufficiently compelling to require that we penalize a naturalized citizen for the expression of silly or even sinister-sounding views which native-born citizens utter with impunity. The judgment must accordingly be reversed and the case re-

678

manded to the District Court for further proceedings not inconsistent with this opinion.

*Reversed.*

Mr. Justice Murphy:

The issue in this case is clear. The Government has sought to set aside petitioner's naturalization certificate because of alleged fraudulent and illegal procurement. It was thus incumbent on the Government to meet the standard of proof laid down by this Court in *Schneiderman* v. *United States,* 320 U. S. 118, 125, 158, by presenting evidence of a "clear, unequivocal, and convincing" character which did not leave "the issue in doubt" as to whether petitioner fraudulently or illegally procured his certificate.

It is true that in the *Schneiderman* case we were met with the issue as to whether the petitioner in that case had illegally procured his naturalization certificate in that he had not, at the time of his naturalization and five years prior thereto, behaved as a person attached to the principles of the Constitution, and well disposed to the good order and happiness of the United States. We expressly did not pass upon the charge of fraud in obtaining the certificate, which is the primary charge present in this proceeding. But the requirement that the Government prove its case by "clear, unequivocal, and convincing" evidence transcends the particular ground upon which the Government seeks to set aside the naturalization certificate. The decision in the *Schneiderman* case was not merely a decision of an isolated case. It was a formulation by a majority of the Court of a rule of law governing all denaturalization proceedings.[1] That rule of law is

---

[1] The denaturalization proceeding in the *Schneiderman* case was brought under the provisions of § 15 of the Act of June 29, 1906, 34 Stat. 596, 8 U. S. C. § 405. Practically identical provisions are con-

equally applicable whether the citizen against whom the proceeding is brought is a Communist, a Nazi or a follower of any other political faith. This requirement of proof was recognized by the court below, 138 F. 2d 29, 34, and by both the Government and the petitioner before us.

In the instant case the failure of the Government to present evidence of a "clear, unequivocal, and convincing" nature that petitioner fraudulently or illegally procured his naturalization certificate in 1932 is patent. With one unimportant exception, the Government proved only that petitioner displayed certain Nazi sympathies and was critical of the United States several years after 1932. There was no competent evidence that he entertained these strong beliefs or that he had any mental reservations in forswearing his allegiance to the Weimar Republic in 1932.

American citizenship is not a right granted on a condition subsequent that the naturalized citizen refrain in the future from uttering any remark or adopting an attitude favorable to his original homeland or those there in power, no matter how distasteful such conduct may be to most of us. He is not required to imprison himself in an intellectual or spiritual strait-jacket; nor is he obliged to retain a static mental attitude. Moreover, he does not lose the precious right of citizenship because he subsequently dares to criticize his adopted government in vituperative or defamatory terms. It obviously is more difficult to conform to the standard set forth in the *Schneiderman* case by mere proof of a state of mind subsequent to naturalization than by proof of facts existing

---

tained in § 338 of the Nationality Act of 1940, 54 Stat. 1137, 1158, 8 U. S. C. § 738, under which the proceeding in the instant case was instituted. See *Schneiderman* v. *United States,* 320 U. S. at 121, note 1.

prior to or at the time of naturalization. But that does not excuse a failure to meet that standard. The naturalized citizen has as much right as the natural-born citizen to exercise the cherished freedoms of speech, press and religion, and without "clear, unequivocal, and convincing" proof that he did not bear or swear true allegiance to the United States at the time of naturalization he cannot be denaturalized. Proper realization of that principle makes clear the error of setting aside petitioner's naturalization certificate on the basis of the facts adduced in this proceeding.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join in this opinion.