**UNITED STATES v. SIEGEL.**

Civ. No. 1113.

District Court, D. Connecticut.

Jan. 11, 1945.

Thomas J. Dodd, Jr., Sp. Asst. to the Atty. Gen., and Robert P. Butler, U. S. Atty., of Hartford, Conn., for plaintiff.

Dennis P. O'Connor and John W. Joy, both of Hartford, Conn., for defendant.

SMITH, District Judge.

This is an action to cancel the certificate of naturalization of the defendant for fraud and illegality on the ground that the defendant lacked attachment to the principles of the Constitution of the United States, intention to forswear allegiance to the German Reich and assume allegiance to the United States, and intention permanently to reside in the United States, by suit brought under Section 338 of the Nationality Act of 1940, 54 Stat. 1158, 8 U.S. C.A. § 738. The allegations as to attachment to the principles of the Constitution, intention to renounce allegiance to the German Reich, and intention to reside permanently in the United States, relate to the petition for naturalization dated May 1, 1937. Allegations as to renunciation of allegiance to the German Reich and assumption of allegiance to the United States also relate to May 4, 1938, the date of the taking of the oath of allegiance to the United States by the defendant. At the pre-trial conference, it was agreed that the fraud and illegality, alleged in Paragraph 8 of the complaint, in the procurement of the certificate of naturalization related to the state of mind of the defendant as involving lack of attachment to the principles of the Constitution, lack of intention to forswear allegiance to the German Reich and to assume allegiance to the United States of America, and lack of intention permanently to reside in the United States, at the times alleged in the complaint. There is no allegation in the complaint that the statement of intention to reside permanently in the United States contained in the declaration of intention filed September 26, 1943, was fraudulent. In the statement, Government's Exhibit No. 4, the defendant, referring to the time of his declaration of intention (1932) states that he had no particular intention of remaining permanently in the United States. It appears to be the defendant's claim, however, that he did have such an

intention at the time of his declaration and also that, at the time of his petition and oath of allegiance, he intended to reside permanently in the United States.

■ The defendant raises the question of the constitutionality of the act under which this proceeding is brought, permitting the revocation of a decree of naturalization and the cancellation of a certificate obtained by fraud or illegality. The decisions, however, recognize the constitutionality of the act. Baumgartner v. United States, 1944, 322 U.S. 665, 672, 64 S. Ct. 1240. Yet the nature of a set of facts necessary to constitute fraud or illegality within the meaning of the act is still in some doubt. Moore (see Note, 3 Moore—Digest of International Law, Section 422, page 500) questions the applicability of the principle of res adjudicata to a decree of naturalization which he contends is not a judgment terminating a pre-existing controversy, but, on the contrary, a basis of constant and repeated future claims on the part of the beneficiary to the rights and privileges of citizenship and the protective action of the government. He points out that the United States Department of State has declined to recognize, as valid grounds for its intervention, decrees of naturalization which it found by recourse to facts outside the record to have been improperly obtained. The misrepresentation which occurred in the naturalization proceeding in most, if not all, of these cases was a misrepresentation as to the length of residence in the United States.

Here, the question is whether false statements of a state of mind made in the petition, or mental reservations in taking the oath, can constitute fraud within the meaning of the act. The cases up to now appear to assume that they can but frown upon proof of such reservations by inference from later acts or statements. Baumgartner v. United States, supra, at 675. In other words, such false statements or reservations are held to be such fraud as can vitiate a judgment, but the quantum of proof is governed by the fact that it is a judgment the plaintiff attacks.

■ This may seem to broaden the historic grounds of attack upon judgments, but some such solution is probably justified by the unique nature of the naturalization judgment and the proceedings leading up to it, which impressed this defendant as merely a "clerical procedure". If,

therefore, it can be proved by clear, unequivocal, and convincing evidence that the defendant made his petition or took the oath lacking attachment to the principles of the Constitution, or lacking intention to forswear allegiance to the German Reich or assume allegiance to the United States, or lacking intention to reside permanently in the United States, the plaintiff may prevail in this action.

The defendant was born in 1898 in Augsburg, Germany, educated in German schools, and eventually awarded a degree in Business Administration at the University of Munich in 1919. He was not accepted for military service during the First World War but did some hospital service work for a period. Following the war, in 1919, he served for a period in the Free Corps Epp, an irregular military organization which fought against left-wing groups in the civil strife around Munich. This Free Corps episode interrupted his studies but he returned to the University of Munich and was graduated in August, 1919. Thereafter he went to Spain, working in a bank in Spain until June, 1922, and carrying on studies in banking. In October, 1922, he entered the University of Frankfort from which he was graduated in July, 1923, with the degree of Doctor of Philosophy in Economics. For one year thereafter, he was employed in a private banking firm, and in the summer of 1924 acquired a partnership in a small private banking firm in which he continued until August, 1930, at first as a partner and later as sole owner. After financial reverses, he made a settlement with his creditors in the spring of 1930 in a court action, establishing the amounts owed and the length of time allowed him to liquidate the indebtedness. His assets at the time appear to have been in excess of his indebtedness, but the assets were not immediately collectible due to the economic depression then prevailing. He continued the business for a short time after the settlement but sold out in August, 1930, to a larger private banking firm. In February, 1931, the defendant came to the United States to study and to obtain some position in the financial business world which would enable him to earn money to apply to the settlement of his debts in Germany and prevent the liquidation of his remaining assets in Germany and those of his wife and daughter and of other relatives which had been endangered by their guar-

antees of his settlement. He was unsuccessful in obtaining employment of the type sought by him but was offered a teaching position at the University of Connecticut. Since he had entered the United States on a student visa, he then obtained a non-quota immigration visa and entered through Canada as an immigrant September 1, 1931. He has been employed on the faculty of the University of Connecticut since September, 1931. During 1932 and 1933, the defendant was also employed by the German dye trust's New York office in an advisory capacity. The defendant brought his wife to this country in 1931, his daughter in 1932. They have made their residence here with him except for a number of visits to Germany. His daughter has grown up here, with the exception of trips and of one year spent by her at school in Germany. The defendant was never a member of the Nazi Party and, particularly in the early days of Hitler's régime, was opposed to some of its internal policies, notably the regimentation of the people and the methods employed against the Jews. He was always, however, an enthusiastic supporter of Hitler's efforts to expand and strengthen Germany internationally, applauding with a great deal of feeling German diplomatic and military successes. He lectured steadily from the start of his teaching career, in this country until 1941, in an effort to present the German viewpoint, particularly on the claimed injustice of the Treaty of Versailles. He kept in close touch with the German government's representatives· in the United States, and consulted with them on the subject of his lectures. This lecturing activity he considered a part of the so-called "small propaganda" for the German cause, aimed at justifying the international course taken by Germany and creating a friendlier feeling toward the German government on the part of Americans, as an aid to the German program of creating and expanding a stronger, larger, and more powerful Germany.

When the defendant first came to the United States, he intended to return to Germany. After taking the position at the University of Connecticut, however, his plans seem to have been somewhat indefinite at first, based largely on the hope of cleaning up his indebtedness in Germany and freeing his property there from obligations. This turned out, however, to be a long-drawn-out task, and he was forced to depend largely on his German income from his properties there to cut down the debts. He also attempted to use some of his German income to transfer some funds to himself in the United States and became entangled in legal proceedings brought by the German government against him, in which a penalty was assessed against him for his effort to evade the foreign exchange regulations, in spite of his frequent protestations to the German government of the scope and value of his propaganda activities in this country. In these proceedings, he had his attorney in Germany hold him out as an ardent Nazi, and in later efforts to obtain the transfer of funds from his income in Germany to the United States also stressed his services to Germany in his propaganda work and his acquaintance with Hans Frank, son of his attorney, who was a Bavarian justice under the Nazis and later Governor of Poland.

It is his claim that his attitude toward the actions of the German government was purely objective, that he understood and attempted to explain the reasons for many of the things done by the Nazis while he did not approve of them. From his correspondence it would appear that this was true in some degree in his earliest years in the United States, but that, long prior to his naturalization, as international tension grew and more aggressive steps were taken by the Nazis, he was highly elated by the success of these steps and became embittered toward the Jews and British whom he blamed for the spread of anti-German feeling in this country, and, eventually, extremely embittered against President Roosevelt and his advisors or purported advisors, and even those of his own students and colleagues at the University of Connecticut, who were opposed to the policies of the Nazis, even though it may be said that he never entirely approved, without some reservations, the Nazi methods of persecution.

After the outbreak of the war in Europe, he returned from a visit in Germany, the last of his annual vacations there, coming back to the United States partly because of his inability to take part in the German war effort, partly to help Germany by carrying on his propaganda activity here, and partly because of the desire of his wife and daughter that the family continue to reside here. Thereafter, his lecturing activities in the United States were

met with great opposition and were cut down and eventually abandoned before the entrance of this country into the war. His correspondence during this period shows that he considered himself more a German than an American. It appears to be his claim that his opposition to the American attitude toward the war was not an opposition to what he thought was the true attitude of most Americans, but to the anti-German policies of the Administration, his bitterness toward which he ascribes, in part at least, to his association with many of his colleagues who were Republicans and strongly anti-Roosevelt. Apparently, during this period, he did attempt to obtain positions with the Red Cross in the hope that he could be of some assistance in Poland because of his acquaintanceship with Hans Frank, and attempted to obtain a commission as a reserve officer in the Army of the United States. After our entry into the war, he sought various government positions in war agencies and gave blood to the Red Cross, and his wife and daughter took part in some Red Cross activities. He also contributed time to a review of the German curriculum at the United States Naval Academy at Annapolis, at the request of an officer in the United States Naval Reserve who had been a teacher at the Academy. Explanation of these apparent inconsistencies may be found in their dates. The Government contends that the defendant's correspondence gives his true state of mind and that the other activities were merely a blind to protect himself after he knew he was suspected of being a German agent, and after he knew that his good faith in obtaining citizenship might be attacked in an action such as this. It is also possible that there is an inference to be drawn from some of his correspondence that his effort to become a reserve officer in the Army of the United States was for the purpose of improving his status as an ostensibly disinterested lecturer on the war situation. It is his own contention that those activities show that his true allegiance was to the United States, in spite of his continuing love for Germany and the German people and its pre-Nazi culture, and that the correspondence is explained by the knowledge that it would be subject to censorship in Germany and in Spain as well as a desire to be agreeable to the relatives and friends with whom he was corresponding. The attention paid to the censorship is claimed to be based not only on a desire to protect his relatives, friends, and his own property from reprisals by the Nazis, but also on his efforts to obtain an advantage in his dealings with the German Foreign Exchange Office.

There may have been some coloring of correspondence by reason of the fact that it was going to Germany and because of the allegiance to Germany of those to whom it was sent, and their known attitude toward those of German birth who were living in this country and could be considered to have selfishly abandoned their former homes, friends, and relatives, for a place of greater safety in the critical times which lay ahead. There is, however, a note of genuineness in most of the correspondence, particularly with close friends and members of the immediate family. Reading the letters, it is easy to credit the defendant's explanation of coloring and exaggeration in those which went directly to the Nazi agencies or to the defendant's attorney to be presented to a Nazi agency, but there is no great similarity between those and the letters to the family and friends which contain an outpouring of the defendant's feelings which was not required to impress the censors. It is impossible to escape the conclusion that the latter were accurate portrayals of the defendant's state of mind at the time that they were written. They show clearly his state of mind toward his obligations to the two nations. So far as intention to remain in the United States is concerned, in the absence of some opportunity to serve in Germany in case of war, however, it is possible that his attachment to Germany was actually outweighed by the facts of the situation in which the defendant found himself. At least until the outbreak of the war in Europe, his continued work and residence here had many desirable elements for him. He had much greater freedom in his work and in his daily life than he could have in Germany. His wife, who is of partly Jewish descent, was not faced with the same problems she would have been faced with in Nazi Germany. His daughter had grown up in this country and considered it her home, and, at least until the outbreak of the war in Europe, had a greater love for the United States than for Germany.

The defendant had taught here for some years and there existed apparent security in his position, with retirement possibilities in the future. He did feel, however, some

sense of guilt because of his inability to perform military service for Germany in the First World War and again in this war. And so it may be that the importance he attached to Von Feldmann's request that he come back to the United States and continue his propaganda activity here was in the nature of a self-justification, a reason upon which he could seize, without loss of his own pride or self-esteem, as the cause of his return, an action which he might have taken in any event because of the pressure of the other circumstances outlined. It is significant, as bearing on the questions of attachment and allegiance, however, that then, more than a year after his naturalization, his first consideration was how best to serve Germany.

The defendant's propaganda in favor of Germany prior to Pearl Harbor served the United States ill. Yet if he were a native-born citizen, it would have been within his rights of free speech. It was also within his rights of free speech as a naturalized citizen. His purpose in this activity, as expressed in his letters, is important, however, in its portrayal of his state of mind with regard to his allegiance at the crucial times. The evidence appears to indicate that the activity was primarily the defendant's own idea. It fitted in with the Nazi propaganda line, a fact which the defendant recognized and used in his attempts to gain advantage from the Nazi government agencies. It did represent his beliefs and was a task he had set himself, to improve understanding of the German people as he saw them. Moreover, he felt that it was a duty to Germany, the most important single aim of his life here, and he carried it on with the advice and approval of German government agents. It is evidence of retention of allegiance to Germany, going far beyond a mere expression of his love for a land he had left, allegiance to which he had formally abandoned. It is evidence that the oath of allegiance was objectively untrue. The Government argues that it was also intentionally untrue, that he was here as a German "tourist" as part of the Fifth Column sent by the Nazi government, and links his presence here with the sinister implications of his touring in many other countries, during his annual or sabbatical leaves, just before they were overrun and enslaved by the Nazis.

We must bear in mind that three questions involving the state of mind of the defendant at the time of his petition and oath are presented by the pleadings in this case: (1) Attachment to the principles of the Constitution, (2) allegiance, and (3) intention to reside permanently in the United States. As to the first of these, the Government appears to have abandoned its claim that the evidence of his state of mind at the critical times is clear, convincing, and unequivocal. The evidence does not meet the tests laid down in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240; and United States v. Rossler, 2 Cir., 1944, 144 F.2d 463, 465, —as to attachment, in view of the fact that this defendant, prior to leaving Germany, was apparently not a member of the Nazi Party and preferred other methods of government to some of those used by the Nazis. In view of his expressed intention, almost contemporaneous with his taking of the oath, to abide by the laws of the United States, it cannot be said that it has been proved by evidence clear, convincing, and unequivocal, that he failed to measure up to the standard set by the Rossler case, supra,—"that attachment to the principles of the Constitution which the law exacts at naturalization is not addressed to the heart; it demands no affection for, or even approval of, a democratic system of government; but merely an acceptance of the fundamental political habits and attitudes which here prevail, and a willingness to obey the laws which may result from them." The evidence as to his intention to reside permanently in the United States needs careful study, with particular attention to the period between his declaration of intention, at which time he had no intention permanently to reside in this country, and the date of his oath. The expressions during that period show a hope that his financial condition would so improve that it would be possible for him to return to Germany for permanent residence, accompanied by a growing distaste for his life in the United States due to the increased tension between himself and others brought about by the development of the European political and military situation as well as by his propaganda activity for the Germans. At the same time, however, he did remain in this country where his employment continued at the Univer-

sity of Connecticut, and he considered the possibility that the situation would be such that he eventually would reach retirement as a member of the faculty of the University. His wife and child, up to the time of his naturalization, much preferred permanent residence in the United States to any prospect of returning to Germany permanently.

Many of his actions were consistent during this period with an intention to return permanently to Germany,—his efforts to build up what he called the administration of his finances in Germany, his dealings in real estate, and construction of housing units near Lake Constance. If he had the burden of showing an intention to remain here permanently, he would find it difficult to sustain it.

If the Government need merely prove by a preponderance of the evidence that he had no such intention, the Government might well succeed. However, the evidence of his concealment of a lack of intention to remain permanently must be clear, unequivocal, and convincing. It does not meet that standard.

On the question of allegiance, we have not only the evidence of the actions of the defendant, including his propaganda activity before and after naturalization, but his own contemporaneous analysis of the meaning to him of the step he was taking. Dr. Siegel "changed his passport" by an "automatic procedure" or "clerical procedure". He felt that this did not mean much. (Government's Exhibit No. 20, dated April 10, 1938, R 1118.) It is clear that, if allegiance to the new sovereign means anything more than an intention not to break the laws, allegiance to the United States was not assumed by Dr. Siegel, and even if it means only that, the propaganda activity of Dr. Siegel and his intention to return to Germany and stand beside his German brothers in case of war, show that he did not forswear allegiance to the Reich but that his state of mind was, at best, one of a divided allegiance. The Baumgartner case, supra, leaves open the question of whether the test is objective or subjective. Objectively, a state of mind which involves a divided allegiance makes the oath false, and it would seem that in a situation such as this, where the retention of allegiance, in part at least, to the country of origin was a conscious retention even though the petitioner believed that it met the requirements of the naturalization law, it is also

subjectively false. This is not a case where the Government attempts to show, by evidence of later statements and actions as proof of his state of mind at the time of naturalization, that a conflict must have existed at the time of naturalization. Here, the letters, at or about the time of naturalization, show the struggle which was then going on in his own mind between the duty he felt to support the Reich, his old sovereign, in its program of expansion, by his return to stand beside his German brothers in case of war and by his propaganda activity to induce the American people to understand and accept the expansion program, and the duty he felt to his new sovereign, the United States, to live as a law-abiding citizen within its borders. This conflict he recognized and sought to resolve by compromise, carrying out duties which he felt were owed to each sovereign.

█ The American doctrine of voluntary expatriation does not admit of dual allegiance, nor does the act under which the defendant was naturalized. Even the Rossler case, supra, requires a willingness on the part of one to be naturalized to throw in his lot with his new country and make its fate his own.

Had he, merely as an intended American citizen of German descent and nationality, lectured, he would have been within his rights. But when he, at the very period of his preparation for, and adoption of, American citizenship, carried on this lecturing consciously as part of the German propaganda, in consultation, cooperation, and concert with the German authorities as part of his duties to his country of origin, he demonstrated at the crucial times a divided allegiance. His own utterances in his correspondence show beyond any reasonable doubt that he felt, and acted upon, this duty to Germany. There was, therefore, a knowing mental reservation in his swearing of allegiance to the United States and in his renunciation of allegiance to the Reich. The very words of the oath make plain that the allegiance required is full and complete, that wherever a man's affections may lie, he must recognize duties to only one sovereign, his adopted country.

At the common law, there were two grades of allegiance, (1) that of a citizen or subject, which grew out of the feudal duty to the superior lord, and (2) local or actual allegiance, due from an alien while resident in a country in return for the pro-

tection afforded by the government. This second type of allegiance, involving the duty to obey the local laws, was owed by Dr. Siegel as a resident alien before his naturalization. It is evident from his letters that he intended by his "change of passport" little or no change in these legal relations between himself and the United States.

Divided allegiance does not meet the requirements of the oath, and the taking of the oath while consciously maintaining a divided allegiance must be considered a fraud and grounds for cancellation of citizenship.

Germany itself in the past appears to have declined to recognize the validity of American naturalization where there was a retention of German allegiance by the person naturalized. See 3 Moore—Digest of International Law, Section 394, page 407, referring to seven cases where United States intervention with German authorities on behalf of individuals naturalized in the United States was unsuccessful for that reason.

The test is whether the evidence shows clearly, convincingly, and unequivocally, such a state of mind at the time of naturalization, and not at some later date, although actions and statements at a later date may throw some light on the state of mind at the critical times. In this case, the later evidence of Dr. Siegel's continued propaganda activity until 1941, and his offer of his services to Germany at the outbreak of war in Europe in 1939 and return to the United States to carry on propaganda activity at Von Feldmann's request,—on the one hand, and his statements to his students, blood donations, and offers of his services to this country after Pearl Harbor,—on the other, might be taken as evidence of later changes in his allegiance, first toward Germany, and then toward the United States. As such, they are not important in this case. They are, however, of some relevance as corroborative of the conflict of mental attitude toward allegiance which the earlier evidence indicates existed in his mind at the time of naturalization.

The allegations concerning the defendant's intention to reside permanently in the United States and concerning the defendant's lack of attachment to the principles of the Constitution of the United States are not sufficiently established to meet the rigorous standard of proof necessary to prove fraud in this case.

The plaintiff has established by clear, convincing, and unequivocal proof that the defendant at the time of his petition for naturalization, May 1, 1937, did not intend to forswear allegiance to the German Reich, and did not intend to assume allegiance to the United States.

The plaintiff has also established by clear, convincing, and unequivocal proof that the defendant did not renounce allegiance to the German Reich or assume allegiance to the United States without mental reservations of allegiance to the German Reich on May 4, 1938, the date of the taking of the oath of allegiance to the United States by the defendant.

Judgment may be entered in accordance with this opinion, revoking and setting aside the decree of naturalization of the defendant, cancelling his certificate of naturalization and directing its surrender to the clerk of this court, and enjoining the defendant from claiming any future right, privilege, benefit, or advantage under it.