MATTER OF P—R—

In DEPORTATION Proceedings

A-11322755

*Decided by Board August 5, 1960*

Expatriation—Section 401(j), Nationality Act of 1940, as amended—Evidentiary standard not satisfied.

Evidentiary standard applicable to expatriation cases precludes finding of loss of citizenship under section 401(j) of Nationality Act in circumstances where native-born citizen was taken to Mexico by his parents at age 6 in 1930 or 1931 and did not return here until 1950, despite his testimony, later repudiated, that he remained abroad in deference to the wishes of his parents who refused him permission to return to the United States at an earlier date because of fears regarding his liability for wartime military service.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Entry without inspection.

### BEFORE THE BOARD

DISCUSSION: By order dated August 9, 1957, the special inquiry officer ordered respondent deported on the charge that at the time of his last entry from Mexico during the summer of 1955, he was not inspected (as an alien). The special inquiry officer found that respondent who was born December 3, 1925, in El Monte, California, and was taken to Mexico by his parents in 1930 or 1931, where he resided until 1950, lost his United States citizenship pursuant to section 401(j), Nationality Act of 1940, 54 Stat. 1137, as amended by the Act of September 27, 1944, 58 Stat. 746,[1] by remaining out of this country on and after September 27, 1944, until November 10, 1950, for the purpose of evading service in the Armed Forces of the United States. Therefore, upon arrival in 1955, he was an alien and subject to inspection as such.

[1] Sec. 401 provides that:

A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States.

30

There was introduced as evidence in the present proceeding exhibit 2, a complete transcript of the testimony before the board of special inquiry at Calexico, California, on March 27, 1952, the May 20, 1952, decision of the Assistant Commissioner, and the December 30, 1952, decision of the Board of Immigration Appeals. The special inquiry officer pointed to the fact that on the basis of the alien's testimony and admissions before the board of special inquiry on March 27, 1952, the Board of Immigration Appeals in its decision of March 30, 1952, found that respondent had remained in Mexico from 1944 to 1950 to evade and avoid training and service and had, therefore, lost his United States citizenship.

In the proceeding now before us, respondent testified that he was unable to remember any of the questions and answers, except one, as reflected by the transcript of the testimony before the board of special inquiry at Calexico, California, on March 27, 1952. Respondent denied his initial testimony to the effect that (1) his mother did not want him to come to the United States because of fear that he would be inducted into the military service of this country; (2) that his parents would not give him permission to come to the United States; (3) that he had remained out of the United States from the time he was 18 years of age until the year 1950, because he did not want to serve in the Armed Forces of the United States; and (4) that he was afraid to do so.

Respondent's testimony in the present proceeding is also to the effect that he did not know he was born in the United States or that he was a citizen of this country until the year 1947 when he was informed for the first time by his father. This special inquiry officer made a point of the fact that respondent was unable to give any reason why he remained out of the United States from the time he was 18 years of age in 1943 until the year 1950. However, respondent claims that had he known that he was a citizen of the United States and had he had evidence of such citizenship he would have come to this country before the year 1950. Respondent's brother came to the United States in 1946 or 1947, and according to respondent's present testimony it was about that time the father told him, respondent, that he had been born in the United States. Respondent's brother obtained a birth certificate for him and brought it to respondent in Mexicali, Mexico. Three years thereafter, 1950, respondent entered the United States by presenting such birth certificate and went to El Monte, California, to join his brother; he did not have information concerning the requirement for registering for military service until he came to the United States in 1950, and he thereafter registered in December of that year at Alhambra, California; he was willing then to serve in the armed forces if called; and he had never thought of coming to the United States

until 1950 when he was told by his brother that it would be possible for him to come if he could obtain a birth certificate for him. Respondent also testified that he first learned that the United States was at war after his arrival in this country in 1950, and that he had never requested permission from either of his parents to come to the United States in 1943, 1944 or 1945.

Respondent also denied that in his previous testimony he stated that his father and mother had always been well and strong. While it appears he so stated, he was testifying as of 1943, when he reached his 18th birthday. As a matter of fact, he also testified at that time that his mother had died of pneumonia after a short illness; that she had had several heart attacks from the year 1940 until her death in 1949; and that his father had been slightly incapacitated by the loss of some fingers and toes.

The special inquiry officer indicated that respondent's sworn testimony in 1952[2] materially conflicts with his testimony in the present proceedings. The special inquiry officer felt that he would not be justified at this time in rejecting respondent's prior testimony to accept his present version of the truth of the matter, citing *United States ex rel. Tsevdos* v. *Reimer*, 108 F.2d 860, cert. den. 310 U.S. 645; cf. *United States ex rel. Schlimmgen* v. *Jordan*, 164 F.2d 633; *United States ex rel. Chartrand* v. *Karnuth*, 31 F. Supp. 799.

The special inquiry officer also cited *Matter of C—D—*, 6—485 (Jan. 4, 1955), in which this Board held that:

United States citizenship was lost under section 401(j) of the Nationality Act of 1940, as amended, where the individual had a desire to return to the United States on and after September 27, 1944, but voluntarily assented to the wishes of his parents that he remain in Mexico because they were unwilling to have him serve in the Armed Forces of the United States. The motive of the parents for refusing him permission to return to the United States is imputed to the child because he voluntarily assented to their wishes. [Citing *Matter of M—*, 2—910 (B.I.A., 1947).][3]

The special inquiry officer accordingly concluded that the standard of proof required to establish expatriation in this case having been met, the respondent had thereby lost his American citizenship under section 401(j) of the Nationality Act of 1940, by remaining outside the United States for the purpose of avoiding training and service in the land or naval forces of the United States. *Gonzales* v. *Landon*, 350 U.S. 920 (Dec. 12, 1955).

Counsel, on the other hand, submitted a brief in conjunction with the appeal in which he argues that on the basis of the decision of the United States Supreme Court in *Gonzales* v. *Landon*, 350 U.S. 920 (Dec. 12, 1955), the Board reconsider its order of December 30, 1952, and find that respondent has not lost his American citizenship

---

[2] See Appendix "A."

[3] See Appendix "B."

acquired at birth by expatriation, as alleged, and that proceedings be terminated.

The Supreme Court of the United States in the case of *Gonzales* v. *Landon, supra,* held *per curiam* as follows:

The Court is of the view that the standard of proof required in denaturalization cases (see *Schneiderman* v. *United States,* 320 U.S. 118; *Baumgartner* v. *United States,* 322 U.S. 665) is applicable to expatriation cases arising under § 401(j) of the Nationality Act of 1940. 54 Stat. 1137. as amended. and has not been satisfied in this case. Accordingly the judgment below is reversed without reaching the constitutional questions that have been presented.

The facts in the *Gonzales* case are set forth in the opinion below, *Gonzales* v. *London,* 215 F.2d 955 (Sept. 8, 1954).[4] The pertinent facts are as follows:

It was stipulated at trial that plaintiff was born in the United States and was less than two years of age when taken to Mexico. Gonzales testified that from 1926 to 1946 he resided in Chihuahua, Mexico. His father died and subject did not come to the United States because his mother would not let him. He testified that he registered for military service in Mexico in 1942. He also stated that he was admitted to the United States on April 23, 1946, upon his claim of United States citizenship by presentation of a birth certificate and baptismal certificate to the Immigration Service. The statements of Gonzales before a board of special inquiry of the Immigration Service in 1947, 1950, and 1952 were introduced in evidence. There was a stipulation that, if the officers were called, they would verify his answers as shown in the transcript. Gonzales swore that he did not make the answers and that he had not remained in Mexico in order to avoid military service.

The District Court determined that although plaintiff was a citizen by birth he had expatriated himself by remaining outside the jurisdiction of the United States in order to avoid training and service in the armed forces of this country in time of war. Plaintiff claimed that the United States had the burden of proof to show Gonzales was no longer a citizen. The trial court followed the contention. But the ground which the Court chose was that Gonzales had expatriated by his voluntary act with the intent of avoiding military service. Gonzales swore to the contrary. The finding of the Court is overwhelmingly supported by statements of plaintiff himself before the officers in 1947 and 1950. The objection urged here is that such statements are hearsay and inadmissible except for purposes of impeachment. The alien's testimony in the record is contrary to these statements. From the facts in the record, the plaintiff, an American citizen, remained in Mexico while the United States was involved in a war in which it was his duty to offer military service. He made no effort to come within the borders until it was apparent the need for his services had passed. The Court might have drawn the obvious inference that the absence from the country was voluntary and for the purpose of evading military duty. If the trial court found plaintiff noncredible as a witness and disbelieved his testimony in court as to a contrary state of mind, the case of plaintiff would then fail.

These extrajudicial statements of plaintiff are not hearsay. These were substantive evidence. The extrajudicial statements of a party, civil or criminal, are binding upon him and substantive evidence against him. There is an additional reason for the admission of these well-authenticated utterances

---

[4] See *Mackey* v. *Mendoza-Martinez,* 362 U.S. 384 (Apr. 18, 1960).

654377— 63———4

of plaintiff since they were statements against interest and thus have further guarantee of verity. They were clearly admissible for all purposes. The only question which gave pause at the threshold was whether these were admitted only for the purpose of impeachment. An examination shows that the record of the hearings, including these statements of plaintiff, was admitted upon stipulation of counsel for the plaintiff for all purposes.

The judgment of denial of declaration of citizenship was affirmed.

Thus, in the *Gonzales* case the court below found:

1. The mother would not permit Gonzales to come to the United States;
2. Gonzales denied prior statements that he remained out of the United States to avoid military service;
3. Gonzales made prior conflicting statements;
4. Gonzales made statements against interest; and
5. The District Court, which was affirmed by the Circuit Court, found that Gonzales had become expatriated by his voluntary act with intent to avoid military service, although Gonzales swore to the contrary.

In our order of December 30, 1952, in the case now before us, we found that P—R— testified he had a definite desire to return to the United States from 1944 to 1950, but was deterred by his mother's unwillingness for him to serve in the United States Armed Forces. We also took note of the fact that he admitted he remained outside the United States to evade and avoid military service during said period, primarily because he was unwilling to serve in our armed forces. We concluded that this established expatriation.

Upon reconsideration, we find that our holding in the case now before us on appeal, as well as *Matter of C—D—*, 6—485 (Jan. 4, 1955), relied upon by the special inquiry officer, and *Matter of M—*, 2—910 (B.I.A., 1947), cited by us in *Matter of C—D—*, *supra*, to the effect that the motive of the parents is imputed to the child where he voluntarily assents to the parents' wishes in refusing him permission to return to the United States, under circumstances such as are present in this case has been rejected by the Supreme Court of the United States in the *Gonzales* case, *supra*.

Accordingly, applying the standards set forth by the Supreme Court in the *Gonzales* case, we conclude that the evidence herein does not satisfy same, and, hence, expatriation pursuant to section 401(j), Nationality Act of 1940, 54 Stat. 1137, as amended, has not been established.

**ORDER:** It is directed that respondent's appeal be sustained.

### APPENDIX "A"

Pertinent part of the respondent's testimony before a board of special inquiry at Calexico, California, on March 27, 1952:

Q. When did you reach the age of 18 years?

34

A. On December 3, 1943.

Q. Was your father well and able to work at that time?

A. Yes, he was very well. He has always been very strong.

Q. Have you always been well and strong and able to work?

A. Yes, we are a healthy family. All of us boys have always had good health.

Q. Has your mother always been strong and able to do her housework prior to the time of her death in 1949?

A. Yes, sir. She was always well and strong. She died of pneumonia and was sick for only a short time.

Q. What wages did you and your father and brothers earn during the period 1943, 1944, and 1945?

A. My father received three pesos a day. We boys received two pesos a day.

Q. Could you not have earned at least five times that amount of money every day in the same kind of work here in the United States?

A. Yes, that is true.

Q. When you reached the age of 18 years on December 3, 1943, did you consider yourself to be a citizen of the United States or of Mexico?

A. I knew that I was a citizen of the United States but we lived a long way from the United States and we never had enough money to pay our way to the United States. J— was the first one to come to the United States and he was able to come only because we all joined together to pay his way.

Q. When you reached the age of 18 years in 1943, knowing that you were a citizen of the United States and knowing that you could earn much higher wages therein, did you desire to come to the United States to work?

A. Yes, we wanted to come to the United States at that time but our mother did not want us to come. We saw the contract laborers coming to the United States at that time, and knew they were going to earn much more money than we were earning and we were very envious but we could not come because my mother did not want us to come.

Q. Did you know when you reached the age of 18 years on December 3, 1943, that the United States and Mexico were allies in a perilous war against powerful enemies?

A. Yes.

Q. Do you know who those enemies were?

A. Germany and Japan.

Q. Knowing that you were a citizen of the United States and knowing that your country was involved in a perilous war, did you have any desire as of December 1943 and thereafter to come to the United States during the late war and offer your services to your country?

A. Yes, I did. And I desire to enter the United States now and there is a war going on now.

Q. Did you ask your father and your mother at any time in 1943, 1944, 1945 for permission to come to the United States to work or for any other purpose?

A. Yes, I did but I did not come because my mother was afraid to have me come at that time.

Q. Did your mother realize that if you came to the United States during that period that you would be liable to induction into the Armed Forces of the United States?

A. Yes, she did and that was the reason she did not want us to come.

Q. If you had been able to secure the permission of your parents to come to the United States during the late war, would you have come?

A. Yes, I would have come.

Q. Did you ever register at the American consulate nearest to Tala, Jalisco, for United States military service?

A. No, I never did go.

Q. Why did you not do so?

A. Until this minute I did not know that there was a way to register at an American consulate. I knew that I could register there as a citizen of the United States but my father did not want us to go over there and register.

Q. After September 27, 1944, did you remain outside the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and Service in the land or naval forces of the United States?

A. Yes, I did. But it was not because I was afraid to come. It was because my parents were afraid to have me come on account of the war.

### APPENDIX "B"

See also unreported *Matter of S—M—*, A–8951306, decided by the Board on October 8, 1956, which held that appellant had become expatriated under the provisions of section 401(j) of the Nationality Act of 1940. M— was born in Los Angeles on April 17, 1917, but was excluded by a board of special inquiry at Calexico, California, on April 22, 1952, on the ground that he had expatriated under section 401(j), *supra*, for remaining outside the United States to evade or avoid military service after September 27, 1944. He was excluded for failure to present the required immigration documents. The Acting Assistant Commissioner affirmed the excluding decision on July 11, 1952, and the Board of Immigration Appeals dismissed the appeal on March 13, 1953. We stated that expatriation under section 401(j) occurs when the evidence shows that the citizen had a desire to come to the United States but was deterred in his resolve primarily by reluctance to serve in the Armed forces, citing *Matter of M—*, 2—910 (B.I.A., 1947). During the 1952 exclusion proceeding M— testified that he lived in the United States from birth until 1922; that in 1937 he obtained a United States citizen's identification card to permit him to work in the United States; that he registered for military service at Calexico, California, on December 11, 1940, and was classified III–A by the El Centro draft board on January 11, 1941; that he was reclassified I–A on May 18, 1943; that he departed to Mexico in June 1943 and remained in that country until 1948; and that between 1949 to April 1952 he was working in California. With regard to his departure in 1943, M— testified that he left because his grandfather was sick and died. He stated that he remained in Mexico "not because I was afraid to enter military service in the United States . . . I told the local board that my wife was subject to attacks." He admitted that he departed from the United States to avoid military service in June 1943. He stated that he realized that he did wrong. The Board indicated that on the issue of expatriation the evidence required this Board to

36

find the loss of citizenship must be clear and convincing, citing *Gonzales* v. *Landon, supra.* The Board determined that its finding of expatriation was based on clear and convincing evidence and was sufficient to support a finding of loss of citizenship under section 401(j). M— took his case before the United States District Court, Southern District of California, and on October 6, 1958, that court found that M— had not lost his citizenship by expatriation as set forth. The court found that M— was born in Los Angeles on April 13, 1917, and that in 1923, at the age of six years, he was taken by his parents to Mexico where he resided continuously until September 1949 when he moved with his wife and children to the United States; that he did not depart from or remain outside the jurisdiction of the United States in time of war or during the period declared by the President to be a period of national emergency, or at any time, for the purpose of evading or avoiding training and service in the land or naval forces of the United States.