## ORTH et al. v. UNITED STATES.
### No. 5235.

Circuit Court of Appeals, Fourth Circuit.

May 24, 1944.

See, also, 3 F.R.D. 20.

Thomas P. Stoney and Malcolm E. Crosland, both of Charleston, S. C. (Edward K. Pritchard and Paul M. Macmillan, both of Charleston, S. C., on the brief), for appellants.

Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C. (Claud N. Sapp, U. S. Atty., of Columbia, S. C., and D. E. Balch, Sp. Asst. to Atty. Gen., on the brief), for appellee.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Eastern District of South Carolina, cancelling the naturalization certificate of Albert Orth and Anna Orth under Section 338 of the Nationality Act of 1940, Title 8 U.S.C.A. § 738.

We are in hearty agreement with the attitude so succinctly expressed by Judge Foster in United States v. Kramer, 5 Cir., 262 F. 395, 397, as follows: "American citizenship is a priceless possession, and one who seeks it by naturalization must do so in entire good faith, without any mental reservation whatever, and with the complete intention of yielding his absolute loyalty and allegiance to the country of his adoption. If he does not, he is guilty of fraud in obtaining his certificate of citizenship."

Our approval of this attitude, however, is tempered by our belief that the deprivation of citizenship should be carefully limited to proper cases. The criteria which we must follow were determined by the United States Supreme Court in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 1341, 87 L.Ed. 1796. The evidence required to establish the Government's right to cancel the certificate of citizenship must be "clear, unequivocal and convincing."

We repeat that American citizenship is a priceless possession, a fact even more patent when two-thirds of the world today is being devastated by bombs, and should not be extended to one who merely seeks physical protection, with no attendant idea of allegiance; nor should one be allowed to retain the benefits of citizenship when he has obtained it through fraud or illegality. It is equally clear that once the rights of citizenship have been granted, more than mere speculation or war time suspicion should be required to annul these rights, United States v. Polzin, D.C., 48 F.Supp. 476; and the approval of the District Court in granting citizenship should be neither lightly considered nor tampered with, in the absence of sound reason for so doing.

As Judge Hutcheson said in Meyer v. United States, 5 Cir., 141 F.2d 825, 831: "It ought to be, it is, in the absence of downright proof of fraud or illegality, enough that one district judge has judicial-

ly determined the right of a naturalized citizen to his citizenship. If that right, established by solemn judgment, is to be taken from him, it ought to be, it can be, taken only upon evidence clearly and positively establishing definite fraud. It cannot be taken upon suspicion or surmise of fraud or upon mere proof that since his naturalization the citizen has given expression to views or allied himself with organizations which in the then state of public opinion seem dangerous or inimical to the public welfare. If these expressions or acts of the naturalized citizen are criminal, he is subject like every other citizen to prosecution for them; if they are not, they subject him to no other legal consequences then a native born citizen doing or saying the same thing would be subject to."

We do not believe that such "downright proof of fraud or illegality" has been established in the instant case.

We set out certain pertinent and undisputed facts, as they appear from the record, and subsequently we shall consider, more or less in detail, the most important evidence relied upon by the Government.

█ Albert Orth (hereinafter called Orth) was born in Germany, of German parents, in 1872. He came to the United States in April, 1891. In the same year he was followed here by his parents, brothers and sisters. Orth's parents were naturalized in September, 1900, prior to his naturalization in November, 1900. In 1896 Orth married a native of Germany, now Anna Orth, codefendant in this action. Her citizenship is derivative, so that it was not necessary for her to take an oath of allegiance to the United States. Orth, in 1904, purchased the Deutsche Zeitung, a German language newspaper published in the City of Charleston, South Carolina. In the same year, he established his residence in that city, where he now resides. The publication of the Deutsche Zeitung comprised only about one-twentieth of Orth's general printing business. Its publication was discontinued as a German language publication in 1917, and it was replaced by a paper published in the English language.

The record discloses that Orth, in 1914, was indicted for aiding one Gustav Drewes, a German reservist, who deserted the crew of the British Steamship Wingate, which came into the Charleston harbor in August, 1914, after a state of war

had been declared between Germany and England. However, this indictment was later nolle prossed by the Government.

Further undisputed evidence shows that in the year 1917, after the United States and Germany were at war, Orth was convicted under an indictment containing two counts for offenses committed in 1916. The first count charged Orth with aiding and abetting the escape, from the Atlanta Penitentiary, of one Knobloch, and one Captain Fay, a German officer convicted of placing bombs on ships sailing out of New York and carrying military stores and supplies. The second count charged Orth with harboring and concealing Knobloch and Fay after their escape. This Court reversed the District Court on the count alleging that Orth aided in the escape, and affirmed the conviction under the second count, 252 F. 566–569. Orth served his sentence imposed under the conviction on the second count.

Additional uncontradicted testimony reveals that after the First World War, the District Attorney's office in Charleston recommended to the Department of Justice that proceedings be instituted to revoke Orth's citizenship. The Department of Justice, after consideration of this recommendation, for reasons which were not disclosed, refused to institute such proceedings.

█ Counsel for the Government have adduced no evidence of misconduct on the part of Orth prior to his naturalization. Evidence of his first allegedly un-American activity was the testimony in regard to aid given to Drewes, the German deserter, in 1914. Even if we attach the worst implications to this act, we see nothing therein clearly inimical to the United States, nor is it "clear" or "convincing" evidence of Orth's mental reservation of allegiance to Germany when he took the oath of allegiance to the United States in 1900. Great Britain, not the United States, was at war with Germany in 1914. Orth's giving aid to Drewes (assuming that he gave such aid) was clearly a violation of the Immigration Law of the United States, and is to be condemned. However, we see nothing in his conduct here which would justify the cancellation of his citizenship.

█ It is strenuously urged by counsel for the Government that certain editorials appearing in the Deutsche Zeitung, the editorial policies of which were allegedly

dictated by Orth, in the year 1916, while not alone sufficient to convict him, are indicative of his·real allegiance and show that he held a mental reservation of attachment for Germany when he took his oath of allegiance to the United States in 1900. A careful reading of these editorials, however, convinces us that they do not tend to establish any such mental reservation. They were written prior to the entry of this country into the First World War; and, while they show an interest in the cause of Germany as against England and a desire that this country stay out of the war, they cannot be said to show a lack of loyalty to this country, much less a lack of loyalty and good faith as of the time the naturalization oath was taken, sixteen years before.

Bearing in mind that the allegation in this case is fraud, and, that under the rule in the Schneiderman case, evidence of words or acts must be "clear, unequivocal, and convincing", we cannot see, in these editorials, any justifiable reasons for the cancellation of Orth's citizenship.

As Judge Kirkpatrick said in United States v. Hugg, D.C.1943, 51 F. Supp. 397, 399: "Once a man is committed to citizenship he must be accorded exactly the same rights as every other citizen of the United States. Otherwise the process of naturalization itself becomes a fraud. These rights include the right of free speech and the right to criticise our Government and to disagree with and oppose its policies. They include the right to read about and to study any forms of political or social activity anywhere in the world and to form opinions upon them."

Nor was it ever intended or expected that a man's memories of his native land should be entirely obliterated by naturalization, or that he should forthwith divorce himself from all political thought or action. Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; United States v. Kuhn, D.C., 49 F.Supp. 407, 411.

The strongest evidence produced by the Government against Orth was his conviction of harboring and concealing Knobloch and Fay after their escape from the Atlanta Penitentiary. Had this act occurred while the United States was at war with Germany, it would have been treasonable and Orth would have been punished accordingly. The same punishment would have been meted out, were he naturalized or American born. Nonetheless, since it is the Government's burden to prove fraud, or that Orth was not attached to the principles of the Constitution when he took his oath of allegiance, Schneiderman v. United States, supra, again we find here no "clear, unequivocal, and convincing evidence" by which the Government has sustained its burden.

As to the other evidence adduced by counsel for the Government, we find the same is true. Much weight was given to the testimony of D. B. Scoggins, who allegedly overheard Orth, in April, 1918, say over the telephone: "We captured Messines Hill and run the Yankees off."

Yet the record shows that on cross examination, Scoggins was vague and uncertain. It can hardly be said that his testimony was clear and convincing.

It has been strongly contended that statements made by Mrs. Orth are admissible to show the state of mind of Orth. Even if we were in accord with the decadent common-law fiction of marital unity (this we emphatically deny), we have no room in our imaginative processes whereby it can be shown that these statements made by Mrs. Orth in 1942 are clearly and convincingly indicative of the state of Orth's mind in 1900.

Proof that Orth has been of good character and that he has contributed to philanthropic causes does not, of course, negative the charge of fraud and disloyalty. United States v. Baumgartner, 8 Cir., 138 F.2d 29; United States v. Haas, D.C., 51 F.Supp. 910, 913. But when a large number of witnesses testify as to the good character of a defendant, and his lack of un-American feeling, some measure of attention, if not credence, should be given to such testimony.

Orth has resided in the United States for many years. With the exception of the allegations of his aid to Drewes, Knobloch and Fay, no concrete act of Orth has been proven to be subversive. There are no allegations, not a scintilla of evidence, in regard to his conduct prior to his naturalization, or within a period of fourteen years thereafter.

In opposition to the Government's contentions, it was shown that Orth made many statements indicating fidelity to the United States. He purchased Liberty Bonds during the last war and urged oth-

ers to do so. He has shown no discrimination against the Jewish race. Nine months before the institution of these proceedings, he offered his entire plant to the United States Government, free of any charge, and also tendered his personal services in the operation of the plant without salary or compensation. He was more than once heard to call the present regime in Germany "damned gangsters". The evidence shows that any praise he had for Germany was largely in reference to her internal industrial development. Such evidence is hardly consistent with the Government's allegations.

We think the findings of the District Judge that Albert Orth had not for the five years immediately preceding his naturalization "behaved as man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same" and that Orth, at the time of his naturalization, took the oath of allegiance to the United States fraudulently and with mental reservations, are "clearly erroneous". Federal Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c.

■ We are not unmindful of the weight that must be given to a finding of fact by the District Judge who saw and heard the witnesses. And we have carefully kept in mind the principle that cases of this kind must not be decided on isolated fact and single circumstances, standing alone. Our decision is reached in the light of the whole picture.

Legal analogies, always dangerous, are yet sometimes quite helpful. A proceeding for denaturalization is more closely related, in the field of marriage, to a proceeding to annul a marriage than to a proceeding for divorce. The denaturalization proceeding deals, as to operative facts, with the situation existing at the time of naturalization, subsequent and supervening acts and conduct can at best rise only to the level of evidential facts. There would be few divorces if the applicant were re-quired not merely to prove conduct after the ceremony that is in itself a statutory ground for divorce but also to show "by clear and unequivocal evidence" that this conduct proves that the marriage vows, when taken, were not taken in good faith. Many a man (even some women) have taken the marriage vows in the utmost good faith and yet, later, have been guilty of adultery, cruelty, desertion, or other statutory ground of divorce.

■ It is well established that no alien may obtain valid naturalization, nor retain it if previously obtained, unless such naturalization was issued in accordance with statutory requirements. United States v. Ginsberg, 1917, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853; United States v. Ness, 1917, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321; United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Bland, 1931, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319. Nor is it to be questioned that the actions, statements, writings and other conduct subsequent to naturalization are properly admissible to prove a state of mind at the time of taking the oath of allegiance to the United States, and to show the purpose for which one sought citizenship. Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; United States v. Schlotfeldt, 7 Cir., 136 F.2d 935; United States v. Kramer, 5 Cir., 262 F. 395; Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182, appeal dismissed 257 U.S. 621, 42 S.Ct. 185, 66 L.Ed. 401. But it is equally well settled by recent decisions of the Federal Courts that the onus of proving fraud or illegality of procurement sufficient to cancel a naturalization certificate rests upon the Government. Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; United States v. Rovin, D. C.1926, 12 F.2d 942; United States v. Sherman, D.C.1941, 40 F.Supp. 478; United States v. Schuchhardt, D.C.1943, 49 F.Supp. 567.

The judgment of the District Court is reversed.

Reversed.