D. K. Hamborsky, Asst. Dist. Atty., Detroit, Mich., for plaintiff.

Harry Kobel, Detroit, Mich., and Capizzi, Valenti & Kwetcher, Detroit, Mich., for defendant.

## UNITED STATES v. CORRADO.
### No. 12337.

United States District Court,
E. D. Michigan, S. D.

April 30, 1953.

PICARD, District Judge.

This is an action to cancel citizenship of defendant on the grounds of both fraud and illegality, brought under Section 338(a) of the Nationality Act of 1940, 54 Stat. 1158.* Proof of either charge will suffice.

Defendant acquired his citizenship under the Act of June 29, 1906, 34 Stat. 596, as amended by Act of March 2, 1929, Chapter 536, § 6(b), 45 Stat. 1513, which provides in part, subsection "Fourth" (3):

> "Fourth. No alien shall be admitted to citizenship unless * * * and (3) during all the periods referred to in this subdivision he has behaved as a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

This requirement remains unchanged in the current Act, 8 U.S.C.A. § 1427(a).

### Findings of Fact
The facts are these:

Defendant came to America in the year 1921, shortly after the first world war and soon took up his home in Detroit. In 1929, he moved to Brooklyn, New York, and on or about May 18, 1931, made application for citizenship. He also appeared before a preliminary ex-

* Now 1952 Revision, 8 U.S.C.A. § 1451(a).

aminer to be interrogated concerning the statements made by him on his application. One of the questions on that application was:

"Have you ever been arrested or charged with violation of any law of the United States or State or any city ordinance or traffic regulation?"

Defendant's answer to this question was "No." While the handwriting in the main body of the application was clearly not defendant's, the application was signed by him. To show that this answer to the quoted question was false, the government has proven that beginning with June 25, 1923, up to and including the day he was naturalized on August 18, 1931, defendant had been arrested at least fifteen times and convicted of two misdemeanors—disturbing the peace on June 25, 1923, and fre-

quenting a gambling place on August 3, 1927.

Shortly after defendant became an American citizen he returned to Detroit, where he has resided ever since.

On July 19, 1946, defendant, through an attorney, asked the Superintendent of Police in Detroit to remove his record except for the two misdemeanors, since "no convictions occurred subsequent to" the other arrests. This was as provided by Michigan Statute, C.L.1929, § 569, M.S.A. § 4.463, Comp.Laws 1948, § 28.243.

Following is the list of arrests and their dispositions, which occurred prior to and during 1931, as submitted by defendant's then attorney to the Detroit Police Department Superintendent at the time defendant's record was expunged:

| 6/25/23 | Dis. peace | $25.00 or 30 days Heston |
| 3/24/24 | Fel. aslt. | Dismissed |
| 1/16/25 | Viol. Dyer Act | TOT. U.S. Marshal |
| 8/6/25 | R.A. | Dismissed |
| 3/30/26 | C.C. weapons | Discharged |
| 4/13/27 | CCW Capias | Discharged |
| 8/2/27 | Freq. Gamb. Pl. | $10.00 or 10 days |
| 2/19/29 | Murder | Discharged |
| 3/15/29 | U.S. Immigration | Discharged |
| 10/28/31 | Murder | Nolle Prossed |
| 12/10/31 | Fugitive | TOT. Wyandotte, Mich. PD. |

Not included in the above list are the following arrests which were proved by the government at the trial:

| 3/13/24 | Murder | Dismissed on writ 3/15/24 |
| 7/26/24 | Robbery Armed | Dismissed by Super. 7/29/24 |
| 9/25/24 | Robbery Armed | Dismissed by Super. 9/26/24 |
| 11/7/24 | Arrested on Investigation—Released on bail—bail forfeited—no disposition | |
| 1/13/25 | Robbery Armed | Dismissed by Super. 1/16/25 |
| 4/26/25 | Robbery Armed | Dismissed by Super. 4/28/25 |

It will be noted that the first nine charges listed by defendant at the time he expunged his record include felonious assault, violation of the Dyer Act, robbery armed, carrying concealed weapons, murder and violation of the immigration laws. Defendant was also finger-printed. The arrests not so listed by defendant include murder and robbery armed and the arrest on "investigation" on November 7, 1924, was in Rochester, New York. At the trial defendant admitted being arrested in Rochester, New York and posting bond—"And I haven't heard from it since."

The robbery armed charge of August 6, 1925, was in Detroit, and was not dis-

missed until September. In this matter defendant put up bond and as he had done before hired a prominent attorney to represent him.

The arrest for murder in February, 1929, terminated the same day. The one on March 13, 1924, was dismissed on writ March 15, 1924.

During the course of the trial the government also sought to prove other arrests taking place subsequent to the date of naturalization under Luria v. U. S., 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; U. S. ex rel. Harrington v. Schlotfeldt, 7 Cir., 136 F.2d 935; Baumgartner v. U. S., 8 Cir., 138 F.2d 29, reversed by the Supreme Court, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 on other ground; and Turlej v. U. S., 8 Cir., 31 F.2d 696. However, this court, on objection by defendant, refused to permit any evidence concerning defendant's alleged improper actions after his naturalization, except to show that on March 9, 1931, while his application for citizenship was pending in Brooklyn and before he was naturalized, an indictment for murder had been returned against him in Detroit and also that he was charged as a fugitive from justice on October 10, 1931. The indictment was for the same murder for which defendant was arrested on February 19, 1929 before going to New York to live. This indictment was the basis for arrest for murder on October 28, 1931, after defendant was naturalized and had returned to Detroit. He was placed on $10,000 bond for this charge, but the case was nolle prossed January 20, 1932.

There is no question or doubt in this court's mind but that defendant had been arrested several times when he made his application for United States citizenship. As a matter of fact defendant admitted the two arrests followed by convictions and also some of the other arrests at trial. He did not deny the others, but was very vague and stated that he "did not remember" them. He was also identified in many of the charged arrests by several police officers

as the man they had arrested. The proof as to each of these arrests is "'clear, unequivocal and convincing.'" Schneiderman v. U. S., 320 U.S. 118, 63 S.Ct. 1333, 1345, 87 L.Ed. 1796. Other findings of fact are commingled with our conclusions of law.

### Conclusions of Law

■ The first question relates to the alleged fraud. Did the defendant intentionally make any false statements? It is his position that he made out his application for citizenship at one of the store offices opposite the Federal Court in Brooklyn, which, of course, would not be unusual. He further stated that he told the person who made out his application all about his arrests, but that this person informed him that nevertheless his answer to the question should be "no." Defendant testified:

"So he asked, was I ever arrested. I say 'yes'. So he told me, 'For what?' So I told him, I said, 'I was arrested for investigation, and I pay a fine of $25, fine for disturbing the peace.' So he told me, he said, 'Well, that is $25 fine for disturbing the peace. That is nothing. That is a misdemeanor.' He said, 'The others—did you ever serve time for anything'? I said, 'No'. Well, he said, 'That is all. As long as you didn't serve no time, that is not necessary'."

It is defendant's position that he failed to answer the question truthfully because the man who helped him fill out his application informed him that if he didn't serve time the arrest didn't count. This court does not believe that latter statement. On the contrary, we believe that he deliberately falsified his position with the intent of misleading the examiner, and that such false statements were material to the issue, because under the numerous authorities Knauer v. United States, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Del Guercio v. Pupko, 9 Cir., 160 F.2d 799; U. S. v. De Francis, 60 App.D.C. 207, 50 F.2d 497; U. S. v. Saracino, 3 Cir., 43 F.2d

76; U. S. v. Charnowola, D.C., 109 F. Supp. 810 and also the rules and regulations in force at the time defendant was examined governing interrogation by the examiner, which provides in part:

"The question of possible arrests must be thoroughly covered. If the applicant has been arrested or charged with a violation of any law or ordinance all the facts will be ascertained including information as to whether conviction resulted."

an applicant for citizenship must present all of the facts and have no guilt or fraud in his heart. He must, to use a common expression, "come clean." See U. S. v. Zgrebec, D.C., 38 F.Supp. 127.

In Knauer v. United States, supra [328 U.S. 654, 66 S.Ct. 1306], fraud is defined as connoting "perjury, falsification, concealment, misrepresentation." Certainly this defendant concealed the fact that he had been arrested. He "falsified" and "misrepresented" and was also probably guilty of perjury. Gaglione v. U. S., 1 Cir., 35 F.2d 496. If he had revealed that he had been arrested it does not necessarily follow that he would have been denied citizenship, but this was information that the examining officers were charged by law with obtaining and to which they were entitled. The seriousness of the offense and the materiality of any arrest or conviction would be then up to the examining officers, and if they wrongfully refused petitioner naturalization he could then appeal to the courts.

We also hold and find that the government examiner relied upon defendant's misrepresentations.

It seems to be the position of defendant that his false statement was immaterial, but when we follow the reasoning of the court in Del Guercio v. Pupko, supra [160 F.2d 800], to its logical conclusion, we must hold that it was very material. True, the Del Guercio case was an application for citizenship where the burden of proof is admittedly different than in a de-naturalization action, but it involved an identical type of misrepresentation as in the case at bar and

the court held that where the petitioner, in his application for citizenship, had falsely denied being arrested or charged with violations of any law, that such false statement of itself involved "moral turpitude and exhibits the unfitness of the applicant for the high privilege of citizenship." A fortiori, if an applicant is refused citizenship because the government caught him in making a false statement in his application for citizenship, should any naturalized person be permitted to keep his citizenship as a reward for having been successful in his deceit? We cannot follow that kind of reasoning. Since the information concealed was asked, and a truthful answer might possibly have prevented defendant from obtaining his citizenship in the first instance, the misrepresentation was clearly material.

The preliminary examiner who had interrogated defendant concerning the answers he had given in his written application for citizenship was a witness at the trial. He identified certain writing and marks on defendant's application having been made by witness. He testified that the check marks which appeared on the application next to several of the questions, including the question about arrests, meant that he had questioned the applicant sufficiently to determine that the applicant had answered the written questions the way he wanted to answer them; that he had questioned the applicant as to the questions asked on the application, in addition to supplementary questions to clarify any given situation in the application. This witness also identified his writing of the letters "NCR" and "RE" on the back of the application and testified that these notations meant "No Criminal Record" and "Reads English" respectively.

Stress is placed by defendant on whether or not this witness' testimony was sufficient since he evidently did not remember Mr. Corrado personally. Mr. White, the preliminary examiner, examined defendant back in 1931, and has not been connected with the government since 1933. He couldn't be expected to

remember examining this individual. If he had said that he actually did remember this particular person we doubt very much if the court would have believed him without some exceptional proof as to why, out of the thousands of petitioners he had examined as examiner, he was able to remember this one. The strength of White's testimony lies in the fact that he just testified to things he did remember.

We are also confronted with the following well settled law:

Under the 1929 regulations pre-petition examinations had to be under oath, United States v. Obermeier, 2 Cir., 186 F.2d 243 and the examiner obliged to check the answers by inquiry. In the absence of any proof to the contrary there is a strong assumption that public officials have properly discharged their duties. Lewis v. United States, 279 U.S. 63, 49 S.Ct. 257, 73 L.Ed. 615; Stone ex rel. Colonna v. Tillinghast, 1 Cir., 32 F.2d 447; Daskaloff v. Zurbrick, 6 Cir., 103 F.2d 579. Defendant himself testified that if he was not mistaken he believed he was made to swear —made to raise his hand. Hence we are forced to conclude that White asked him the necessary questions concerning the answers on defendant's petition, and that defendant carried on the deceit.

We hold that defendant was guilty of fraud and we further hold that he would and should be deprived of his citizenship for having obtained it illegally. His very act in falsifying the facts indicates that at the time he did so he was not "'a person of good moral character'" or "'well disposed to the good order and happiness of the United States.'" Del Guercio v. Pupko, supra. Stevens v. United States, 7 Cir., 190 F.2d 880; United States v. Etheridge, D.C., 41 F.2d 762; See United States v. Accardo, D.C., 113 F.Supp. 783, 786, wherein the court said:

"How can a person claim to be of 'good moral character' or 'well disposed to the good order and happi-

ness of the United States' at the very time he is seeking to defraud the United States, in a matter of moment both to him and to the country?"

The decision of the District Judge was adopted by the Court of Appeals, Third Circuit, in a per curiam decision, 208 F.2d 632.

We are loath to take away the citizenship of anyone but in this case there are several reasons why this court has no faith in the testimony given by defendant except that he probably did have someone else make out the application for him. We disbelieve him because:

(a) His demeanor and evasion while on the witness stand did not impress us:

(b) Even after the letter from his then attorney to the Detroit Police Superintendent asking that certain records be expunged, had been introduced defendant did not admit nor deny some of those arrests, but said from the witness stand that he "didn't remember"; and he took the same position regarding some of the arrests not listed in that letter; (This was his attitude regarding the March 13, 1924 arrest for murder, and we think it altogether improbable that one would not remember such an arrest.)

(c) The defendant was not an "ignorant foreigner"—an impression sought to be created;

(d) His shifting of his residence to New York came about the same time as the murder for which he was indicted in Detroit in 1931; and

(e) Adding two and two together it is apparent to this court from his own testimony that defendant went to New York to make his application for citizenship because of his long police record in Detroit.

For the above reasons we hold that the government has proven its case and that defendant's citizenship should be revoked on both the grounds of fraud and illegality.