**UNITED STATES of America,**
**Plaintiff,**

v.

**Sam TITLE, a/k/a Sam Teitelman,**
**Defendant.**

**Civ. No. 17368.**

United States District Court
S. D. California, Central Division.

June 8, 1955.

and similar provisions in preceding Acts beginning in 1906. Such statutes have been sustained upon the ground that it is within the constitutional power of the Congress of the United States to enact legislation providing a method for determining, by an orderly judicial proceeding, whether

> "one who claims the privilege of citizenship under the certificate of a court has procured that certificate through fraud or other illegal contrivance." [2]

The Act of 1952 added additional grounds for denaturalization. However, in this action we are concerned only with the provisions of §§ 305 and 307 of the Act of 1940 because the naturalization certificate was issued to the defendant on October 24, 1941.

I

The Act of 1940

■■ Section 305 of the Act of 1940 provided, in part:

> "No persons shall hereafter be naturalized as a citizen of the United States— * * *
>
> "(b) * * * who is a member of or affiliated with any organization, association, society, or group that believes in, advises, advocates, or teaches—
>
> "(1) the overthrow by force or violence of the Government of the United States * * *.
>
> "The provisions of this section shall be applicable to any applicant for naturalization who at any time within a period of ten years immediately preceding the filing of the petition for naturalization is, or has been, found to be within any of the clauses enumerated in this section notwithstanding that at the time

Laughlin E. Waters, U. S. Atty., by James R. Dooley, and Arline Martin, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff.

Richard L. Rykoff and Robert L. Brock, Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

The action was initiated by the Government under § 340 of the Immigration and Nationality Act of 1952 (to be referred to as "the Act of 1952") which authorizes the institution of proceedings to revoke and set aside orders admitting to citizenship and to cancel the certificate of naturalization on the ground that

> "such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation." [1]

This section merely carries over into the present Act the provision of subsection (a), § 338 of the Nationality Act of 1940 (to be referred to as "the Act of 1940")

1. 8 U.S.C.A. § 1451.

2. Johannessen v. United States, 1912, 225 U.S. 227, 242, 32 S.Ct. 613, 617, 56 L.Ed. 1066. And see, Luria v. United States, 1913, 231 U.S. 9, 24, 34 S.Ct. 10, 58 L. Ed. 101; United States v. Ginsberg, 1917, 243 U.S. 472, 37 S.Ct. 422, 61 L.

Ed. 853; Bindczyck v. Finucane, 1951, 342 U.S. 76, 71–82, 72 S.Ct. 130, 96 L.Ed. 100; Orth v. United States, 4 Cir., 1944, 142 F.2d 969, 970; United States v. Siegel, 2 Cir., 1945, 152 F.2d 614; United States v. Hauck, 2 Cir., 1946, 155 F.2d 141, 143.

petition is filed he may not be included in such classes." [3]

Section 307 of the Act of 1940 read, in part:

"(a) No person * * * shall be naturalized unless such petitioner * * * (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the United States." [4]

Because citizenship is a valuable right, once it is obtained legally by an alien, the courts must

"jealously guard its revocation." [5]

And revocation can be granted only if the evidence establishing the ground upon which revocation is sought, whether fraud or other, is

" 'clear, unequivocal, and convincing.' " [6]

In the case before us the Government seeks revocation of citizenship under both sections. In count one of the complaint the Government alleges that the naturalization was procured by concealment and willful misrepresentation, i. e., *fraud.* The second count is based upon the nonexistence of required qualifications, and states that the defendant was not a person of good moral character, attached to the principles of the Constitution and well disposed to the good order and happiness of the United States.

Behind these allegations is the alleged fact of membership of the defendant in the Communist Party and affiliated organizations within a period of ten years immediately preceding the filing of the petition.

We restrict our inquiry as to the latter by pointing to the fact that, while in the present state of public opinion, adherence to Communism or approval of its doctrines reflects on a person's character, *to such an extent that it is libel to falsely accuse one of such adherence or approval of ideas,*[7]—the "good moral character" in the Naturalization Statute has reference to the sum total of tendencies or personal qualities which, in our life, induce us to act in accordance with the accepted moral standards of the time,— " 'the commonly accepted mores.' " [8]

Attachment to the principles of our Government implies full adherence and loyalty to the letter and the spirit of American institutions.[9] Suppression and

---

3. This was codified as Section 705 of Title 8 U.S.C.A. Its essence is embodied in the present Section 1424(a) (1 & 4) of the same title.

4. This was codified as Section 707 of Title 8 U.S.C.A. Its essence is embodied in Section 1427(a) (3) of the same title.

5. Sweet v. United States, 6 Cir., 1954, 211 F.2d 118, 120.

6. Schneiderman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796; Baumgartner v. United States, 1944, 322 U.S. 665, 670, 64 S. Ct. 1240, 88 L.Ed. 1525; Bergmann v. United States, 9 Cir., 1944, 144 F.2d 34, 38; Knauer v. United States, 1946, 328 U.S. 654, 657–658, 66 S.Ct. 1304, 90 L. Ed. 1500; Sweet v. United States, supra.

7. Yankwich, Recent Developments in the Law of Creation, Expression and Communication of Ideas, 1953, 48 N.W.L. Rev., 543–551; Yankwich, Trends in the Law Affecting Media of Communication, 1953, 15 F.R.D. 291, 300–305.

8. See, Petitions of Rudder, 1947, 2 Cir., 159 F.2d 695; United States v. Francioso, 1947, 2 Cir., 164 F.2d 163; Schmidt v. United States, 2 Cir., 1949, 177 F.2d 450.

9. Orth v. United States, supra, Note 2. Allan v. United States, 9 Cir., 1940, 115 F.2d 804; Wixman v. United States, 9 Cir., 1948, 167 F.2d 808. And see, United States v. Hauck, 2 Cir., 1946, 155 F.2d 141, 143. In Stasiukevich v. Nicolls, 1 Cir., 1948, 168 F.2d 474, 477, the Court gave the origin and meaning of the phrase "attached to the principles of the Constitution":

"The phrase goes back to the naturalization act of January 29, 1795, 1 Stat. 414. It is hardly to be supposed that the members of Congress of that day, having so recently completed a successful revolution, conceived that the phrase 'the principles of the Constitution' comprehended only one principle, namely,

willful concealment of a material fact may indicate a lack of good moral character. For good moral character implies frankness in one's dealing with one's fellow man and with the Government, and full disclosure when a situation demands it, either morally or legally. In this context, evasiveness may be just as reprehensible morally as direct concealment. So the entire problem turns upon the question of the defendant's Communist membership and affiliation. This is at the root of the Government's case.

In one respect this case is unique. In many of the adjudicated cases in which the criteria of proof were laid down [10] the court had before it the contradictory testimony offered by the defendant himself or by witnesses who testified in his behalf. In the case before us the defendant did not offer himself as a witness. Called to the witness stand by the Government as an adverse party [11] the defendant, other than admitting his signature to certain of the documents executed during the naturalization process, pleaded the privilege against self-incrimination as to all questions relating to his associations or membership in the Communist Party. In this he was sustained by the court being given the full benefit of the latest declaration of the Supreme Court on the subject.[12]

Having sustained the assertions of this right, I draw no unfavorable inferences from the fact of assertion, adhering to the view stated repeatedly that the contrary attitude does violence to the spirit

that changes in the basic law must be effectuated only by the procedure laid down in Article V. The statutory word is in the plural—'Principles', not 'principle'. It is true enough, as Holmes, J., noted in his dissent in United States v. Schwimmer, 1929, 279 U.S. 644, 654, 49 S.Ct. 448, 451, 73 L.Ed. 889, that 'if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.' But it does not follow from this that the Congress would wish to admit to the privilege of citizenship aliens who were so far out of sympathy with our established form of government that they would like to see it supplanted by a totalitarian regime under which all individual liberties, including freedom of thought and freedom of speech, are swept into the discard. A person is not attached to the kindred principles of free thought and free speech when he invokes the protection of those constitutional freedoms in aid of the struggle of his party to achieve power, being all the while intent upon suppressing the exercise of those very freedoms by others as soon as his party comes to power. In the absence of an authoritative ruling by the Supreme Court on the point, we accept the view expressed by Stone, C. J., dissenting, in the Schneiderman case [Schneiderman v. U. S.] 320 U.S. [118] at page 181, 63 S.Ct. [1333] at page

1363, 87 L.Ed. [1796] 1798, that there are principles of the Constitution, within the meaning of the Nationality Act 'and that among them are at least the principle of constitutional protection of civil rights and of life, liberty and property, the principle of representative government, and the principle that constitutional laws are not to be broken down by planned disobedience. I assume also that all the principles of the Constitution are hostile to dictatorship and minority rule; and that it is a principle of our Constitution that change in the organization of our government is to be effected by the orderly procedures ordained by the Constitution and not by force or fraud.' "

The test thus laid down was approved by the Court of Appeals for the Ninth Circuit in Tauchen v. Barber, 9 Cir., 1950, 183 F.2d 266, 267. Cf. United States v. Rossler, 2 Cir., 1944, 144 F.2d 463, 465. For comments on the tests for determining "attachment to the principles of the constitution" as laid down in these cases, see Note, 1949, 47 Mich.L.Rev. 702; Serena B. Colvin, 1949, Attachment to the Principles of the Constitution in Naturalization Cases, 1949, 1 Ala.L.Rev. 228.

10. See cases in Note 6.

11. Section 43(b), Federal Rules of Civil Procedure, 28 U.S.C.

12. Quinn v. United States, 1955, 75 S.Ct. 668; Emspak v. United States, 1955, 75 S.Ct. 687.

of our constitutional guaranties.[13] Nor shall I draw the justifiable inferences permitted from failure to produce evidence which it was in the power of the defendant to produce.[14] However, as stated at the trial, the failure to testify leaves the record without any defensive matter except such as is contained in the cross-examination of the Government's witnesses and some documentary evidence offered by the defendant. For the testimony of the two character witnesses has little significance in a case of this character where, as already indicated, the character of the defendant is not challenged, except insofar as he is charged with certain deliberate and fraudulent concealments of fact. And if these occurred in the naturalization proceedings, the testimony as to good character by witnesses, at least one of whom showed complete unfamiliarity with the charges made in this proceeding, does not help the defendant's cause.

So we are back to the fundamental problems involved, the character of the Communist Party, the defendant's membership in it, his knowledge of its character and the concealment of the fact of membership in the proceedings leading to naturalization.

## II

### The Irrefutable Facts

The defendant was born in 1907 in Nilesht, Bessarabia, which, at the time of his birth, was a part of Roumania, but is now a part of Soviet Russia. He entered the United States at Port Huron, Michigan on June 7, 1923 from Montreal, Canada, his last place of foreign residence. He claimed naturalization by reason of marriage to an American citizen.[15] In his petition for naturalization and in his testimony before the Naturalization Examiner on July 30, 1941, he made oath, in substance, as follows:

"It is my intention in good faith to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which at this time I am a subject or citizen, and it is my intention to reside permanently in the United States.

"I am not, and have not been for the period of at least 10 years immediately preceding the date of this petition, an anarchist; nor a believer in the unlawful damage, injury, or destruction of property, or sabotage; nor a disbeliever in or opposed to organized government; nor a member of or affiliated with any organization or body of persons teaching disbelief in or opposition to organized government. * * * I am, and have been during all the periods required by law, attached to the principles of the Constitution of the United States."

On October 24, 1941, immediately prior to admission to citizenship, he took the oath which, at that time, read:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: So Help Me God."

The petitioner also asked that his name be changed from Sam Teitelman to Sam

13. United States v. Shibley, 9 Cir., 1954, 112 F.Supp. 734, 752–753; See, Yankwich, Some Challenges to Our Constitutional Ideals, 1954, 28 So.Cal.L.Rev. 1, 15–16.

14. Jones on Evidence, Civil Cases, 3rd Ed., 1924, Secs. 19–20. See, Kirby v. Tallmadge, 1896, 160 U.S. 379, 382, 16 S.Ct.

349, 40 L.Ed. 463; Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 225–226, 59 S.Ct. 467, 83 L.Ed. 610; Tendler v. Jaffe, 1952, 92 U.S.App. D.C. 2, 203 F.2d 14, 18–19.

15. See, former Section 310, now Section 1430(a), 8 U.S.C.

Title, which he had used for some years because of "simple spelling".

The evidence in the record shows clearly that within the ten-year period prior to his application for naturalization, the defendant was a member of the Communist Party, his membership dating, at least, to 1936, when he became a member of the Young Communist League, later becoming a member of its County Committee. The Young Communist League was, at that time, an affiliate of the Communist Party, controlled by it, the key positions in it being held by members of the Communist Party.

In 1937, the defendant became a member of the Communist Party. There is in evidence a duplicate membership book issued to the defendant evidencing by stamps the payment of dues for the months of November and December of that year. There is also a receipt in his own hand-writing, dated December 1, 1937, acknowledging receipt of membership book for that year. During that year he was a member of a down-town Los Angeles unit, being later transferred to another. In 1938, he attended a convention of the Communist Party of the United States, which was open only to the members of the Communist Party, chosen as delegates or elected by groups or units.

The defendant participated in the affairs of the convention and listened to the speeches, and was present when the Communist Party organizer for Los Angeles County made one of the important speeches. The defendant attended the Convention of the party in Los Angeles County in 1940, which only key members of the party attended. There is evidence that the defendant attended Communist Party gatherings as one of the party leaders in 1941 and 1942. A document published in 1939, entitled "2 Decades of Progress" and attempting to depict the activities of the Communist Party of Los Angeles for the period 1919–1939, contains a page of greetings from the Communist Party Branch of the 14th Congressional District. This lists Lou Rosser, *one of the witnesses for the Government in the case,* as organizer for the 14th Congressional District and the defendant as *organizer* for the 44th Assembly District. There is also evidence showing that defendant was a member of the Executive Committee for the 14th Congressional District and was present at its meetings.

■ So this is not one of the cases in which former Party members or informers seek to "pin" membership on a person who may have occasionally been seen at a Communist meeting, but as to whom there is no showing of active participation.[16] Here, uncontradicted evidence—some of it in the defendant's own handwriting,—shows activities, first in the Young Communist League and later the Communist Party, dating back to 1935 or 1936. From his brief appearance and conduct on the witness stand, from the manner in which he answered in writing questions relating to his occupation, residence and the like, in the documents he was required to file in the naturalization proceeding and the answers given in his deposition which the Court had to consider in determining the question of privilege asserted during the taking of the deposition, one gathers the impression that the defendant is a person above average intelligence and education, with good command of the English language, showing no trace of accent, such as may be found in persons to whom English is not a native tongue. This, of course, is due to his long residence in Canada and in the United States. All these lead to the inevitable conclusion that his membership in the Young Communist League and the Communist Party *was not fortuitous,* but a matter of deliberate choice by a person who understood its purposes and who, beginning with the task of distributing the literature of the party, rose to trusted position of leadership at the County level. Granted that gregariousness is one of the American characteristics and that persons may join

16. See, Richard H. Rovere, The Kept Witness, 1955, 210 Harper's Magazine, pp. 25–34.

many groups without full knowledge of their object, *we are not* confronted in this case with such a situation. The record before the Court shows a continuous participation in the affairs of the Party, distribution and sale of the literature of the Party, attendance at conventions where policy was determined, a pattern of conduct which continued to the date of naturalization.

### III

#### The Pattern of Revolution

During the period with which we are concerned, 1936–1941, a showing of membership in the Communist Party was not, *of itself*, a bar to citizenship. The proof in this case must, therefore, show that at the time the defendant made the statements and representations alluded to and took the oath of allegiance, and within the ten-year statutory period preceding, the Communist Party was an organization which advocated the overthrow of the Government of the United States by "force and violence".

■ The evidence in the record, oral and documentary, including the documentary evidence offered on behalf of the defendant, shows conclusively that this was the teaching of the Communist Party at the time.

We eliminate from consideration ancient historical documents such as the Communist Manifesto which was issued by Marx and Engels in 1848. It is a historical fact that in the year 1848 and the years preceding it, authoritarian governments all over Europe were crushing by force all democratic movements and aspirations. Indeed, men like Carl Schurz, Louis D. Brandeis and others, who have achieved greatness in American life, were *émigrés* or sons of *émigrés* who participated in the political and social agitations which were being suppressed all over continental Europe at or about the time the Communist Manifesto came into being.

So it may be conceded that Marx and Engels used language which sounds inflammatory to us, but which, in the atmosphere of the day, merely opposed violence from below to force and suppression from above used to destroy what we in the United States have considered legitimate democratic agitation.

We need not, therefore, resort to that ancient document to determine the character of the Communist Party. For historical purposes, the Communist Party as it is known in more recent times, is the party which grew out of Russian Bolshevism and which in 1919, held its first meeting in Russia, at which only one country other than Russia, namely, Germany, was represented. This fact is commonly accepted by scholars and historians in the field.[17] Indeed, the commemorative pamphlet to which we have already alluded, and which carried the name of the defendant as an *organizer* of the Party in Los Angeles County, treats the history of the Communist Party as beginning in 1919, and quotes with approval the preamble of the Constitution of the Communist Party of the United States, which states as its object

"* * * the establishment of socialism, according to the scientific principles of the great teachers of mankind, Marx, Engels, Lenin, and Stalin, embodied in the Communist International."[18]

This constitution, adopted in 1938, *was introduced by the defendant*. It shows, as do other documents to be referred to, that the American Communist Party "ties" its aims to those of the Communist International. And in the litera-

---

17. Max Beer, Communism, 1937, 4 Enc. of Soc. Sci., p. 81; Lewis L. Lorwin, Communist Parties, 1937, 4 Enc. of Soc. Sci., p. 86; Communism, Columbia Enc., 2nd Ed., 1950, p. 432; Communist Party, Columbia Enc., 2nd Ed., 1950, p. 433; A. Rossi, Physiologie du Parti Communiste Français, 1948; Kommunismus, 2 Der

Kleine Brockhaus, 1952, pp. 656–657. See also, Hans Kelsen, The Political Theory of Bolshevism, 1948, pp. 28–33; Jaspers, Vom Ursprung und Ziel der Geschichte, 1949, pp. 220–247.

18. 2 Decades of Progress, 1939, p. 3.

ture it sponsored and circulated and which is before the court, the teachings of Marx and Engels are accepted only *insofar as they are* modified and put into practice by Lenin, Stalin and the Communist International.[19] And these teachings, without deviation, urge *not* a *change of the social system by the use of democratic institutions or legal means, but a revolutionary change by force and violence.*

So far as Lenin is concerned, the pattern, through the years, is unchanged. On December 1, 1917, and for a brief period thereafter, he recognized the Constituent Assembly.[20] But a little over a month later, on January 19, 1918, in announcing its dissolution, he stated:

> "And by the will of the Soviet power the Constitutent Assembly, which has refused to recognize the power of the people, is being dissolved. * * *

> "The Constituent Assembly is dissolved. The Soviet revolutionary republic will triumph, *no matter what the cost* * * *" [21] (Emphasis added.)

His writings for the year 1917–1918, *which were also introduced by the defendant,* and which bear the sub-title "After the Seizure of Power", defend the forcible seizure of power and the need for "the centralized organization of force, the organization of violence." [22]

speak of the needlessness of a "special apparatus of repression" to suppress individual excesses likely to occur.[23] He condemns parliaments as "institutions alien to the toiling masses".[24] In a note of exultation he writes:

> "In Russia the bureaucratic apparatus has been completely smashed up, razed to the ground; the old judges have all been expelled, the bourgeois parliament has been dispersed—and *far more accessible* representation has been given to the workers and peasants; *their* Soviets have replaced the bureaucrats, or *their* Soviets now control the bureaucrats, and *their* Soviets now elect the judges." [25] (Italics theirs.)

Practically the entire volume is devoted to merciless attacks on German and other European Socialists and social democratic leaders and elements, who advocated change through democratic means and criticized Lenin's tactics.

So far we have confined ourselves to documents *introduced by the defendant.* How anyone can find in them any advocacy of lawful means for effectuating the aims of Communism or even "lip-service" to democratic institutions is beyond our comprehension. For there is none, as appears more fully from other writings by Lenin which are in the record. In one of them he states that the proletarian state can only be achieved

---

19. When this is borne in mind, Friedrich Engels' statement in the 1886 Preface to the English edition of Karl Marx's "Capital", *offered in evidence by the defendant,* to the effect that in England, "the inevitable social revolution might be effected entirely by peaceful and legal means" (Karl Marx, Capital, 1954, Moscow Ed., Vol. I, p. 6), loses all meaning. The truth of the matter is that Marx himself did not conceive the possibility of an economically backward country like Russia or China passing to socialism from feudalism or semi-feudalism, and he so stated in the Preface of July 25, 1867, to the first German edition: "One nation can and should learn from others. And even when a society has got upon the right track for the discovery of the natural laws of its movement—and it is the ultimate aim of this

work to lay bare the economic law of motion of modern society—it can neither clear by bold leaps, nor remove by legal enactments, the obstacles offered by the successive phases of its normal development. But it can shorten and lessen the birth-pangs." (Karl Marx, Capital, op. cit., p. 10) But Lenin and his followers used force in attempting to impress socialism upon a country which had only the most rudimentary industrial organization.

20. Lenin, Selected Works, 1939, Vol. 6, pp. 437–438.

21. Lenin, Selected Works, op. cit., p. 459.

22. Lenin, Selected Works, Vol. 7, p. 26.

23. Lenin, Selected Works, op. cit., p. 83.

24. Lenin, Selected Works, op. cit., p. 134.

25. Lenin, Selected Works, op. cit., p. 130.

"through a violent revolution".[26] This is repeated elsewhere.[27]

The Sixth World Congress of the Communist International held in 1928 stated emphatically that *Leninism* is the dominant approach and that

"the overthrow of capitalism is impossible *without* force, *without armed uprising and proletarian wars against the Bourgeoisie.*"[28] (Emphasis added.)

This interpretation is adopted by Stalin who expresses it in this manner:

"The dictatorship of the proletariat is a revolutionary power *based on the use of force* against the bourgeoisie."[29] (Emphasis added.)

We have already referred to the fact that the Communist Party of the United States and the local branch to which the defendant belonged adopted the gloss which Lenin, Stalin and the Communist International placed on Marxist teachings. The literature in the record shows that American Communist conventions and American Communist writers pointed not only to these teachings as correct, but to the practice embodied in the Russian Revolution and the Communist dictatorship enthroned by it as the "way out". The following brief quotations will suffice:

"The experience of the victorious workers of the Soviet Union before, during and after the seizure of power, throw a brilliant light showing the *path which must be followed in every land, the path of Bolshevism, of Marx, Engels, Lenin and Stalin.*"[30] (Emphasis added.)

"A time comes when there is demoralization above, a growing revolt

26. Lenin, Selected Works, op. cit., pp. 20, 73.

27. Lenin, "Left Wing" Communism, An Infantile Disorder, 1940, pp. 66–67.
   In the text references are limited to such of Lenin's works as were introduced in evidence. However, the same contempt for the democratic process and advocacy of violent means of achieving them are found in subsequent volumes of Lenin's works. Illustrative are the following:
   "We declare that we are fighting capitalism as such, the free, republican, democratic capitalism included, and we realize, of course, that in this fight *the banner of freedom is a fraud* if it contradicts the interests of the emancipation of labor from the oppression of capital." (Lenin, Collected Works, 1923, Vol. XIV, pp. 80–81, 203–204) (Emphasis added) * * *
   "No parliament can in any circumstances be for Communists an arena of struggle for reforms for betterment of the situation of the working class * * *The only question can be that of utilizing bourgeois state institutions for their destruction.*" (Ibid., Vol. XXV, p. 566) (Emphasis added) * * *
   "A Communist must be prepared to make every sacrifice and, if necessary, even resort to all sorts of schemes and stratagems, employ illegitimate methods, conceal the truth, in order to get into the trade unions, stay there, and conduct the revoluntary work within * *"

(Ibid., Vol. XVII, pp. 142–145) (As quoted in David Shub, Lenin, A Biography, 1948, pp. 390, 392–393)
   Stalin carried these teachings into effect.
   "Lenin is our teacher," Joseph Stalin told Harold Stassen in 1947, "and we Soviet people are Lenin's disciples." (Hugh Gibson in Preface to Shub., op. cit., VI)
   These teachings postulate permanent dictatorship, under which, as Lenin stated in 1917, there "cannot be liberty or democracy". See, Yankwich, The Nature of Our Freedom, 1950, pp. 103–105, and references in Notes 30 to 34, pp. 118–134 of that text.

28. The Struggle Against Imperalist War and the Task of the Communists, 1932, p. 10.

29. Stalin, Foundations of Leninism, 1939, p. 53. In the same work, he sums up Lenin's teaching as to the dictatorship of the proletariat in this manner:
   "Briefly: *the dictatorship of the proletariat is the rule—unrestricted by law and based on force—of the proletariat over the bourgeoisie, a rule enjoying the sympathy and support of the labouring and exploited masses.* (The State and Revolution)" (Emphasis in text.) (Op. cit., loc. cit.)

30. Manifesto of the 8th Convention of the Communist Party of the United States, as reprinted in The Way Out, A Program for American Labor, p. 53.

below; the morale of the army is also undermined. The old structure of society is tottering. There are actual insurrections; the army wavers. Panic seizes the ruler. A general uprising begins.

"Workers stop work, many of them seize arms by attacking arsenals. Many had armed themselves before as the struggles sharpened. Street fights become frequent. Under the leadership of the Communist Party, the workers organize Revolutionary Committees to be in command of the uprising. There are battles in the principal cities. Barricades are built and defended." [31]

We are far away from any advocacy of peaceful action. What is described and expounded is the technic of revolution to be followed in America. And again:

"*As the leader and organizer of the proletariat, the Communist Party of the U. S. A. leads the working class in the fight for the revolutionary overthrow of capitalism, for the establishment of the dictatorship of the proletariat, for the establishment of a Socialist Soviet Republic in the United States,* * * *" [32] (Emphasis added.)

In one of the speeches delivered by Stalin in the American Commission of the Presidium of the Executive Committee of the Communist International in 1929, he referred to "Comrade Bittelman" and expressed the hope that he and another could be kept in Moscow for a time in order to cure "the American Communist Party of factionalism" and save "it from disintegration." [33] Whether he was so kept or not, we do not know. But in a pamphlet circulated by the Party, he had evidently accepted the Soviet aims and the means of achieving them in America as proper American Communist tactics:

"The only form of government that is truly democratic, a government which belongs to the overwhelming majority of the population and is built and operated by all its toilers, is the *Soviet Form of Government*. This, too, is a dictatorship of a class (no government can be anything else), but it is a dictatorship of the *Working Class*, which rests upon the alliance between the working class and the toiling population of the farms (the small and exploited farmers), and functions for the sole purpose of suppressing capitalist counter-revolution; abolishing capitalist, landlord and imperialist exploitation; and building a Socialist society—the first stage of Communism—for the benefit of all toilers." [34]   (Emphasis added.)

From what precedes, the following facts emerge: The Communist Party from 1919 onward has condemned liberty and democracy and all the ideals of democratic nations as a means of achieving its aims. To the contrary, it has advocated force and violence as the only means for attaining its objectives. The dictatorship which it once urged as a transition is now, in tragic calmination, advocated as permanent. The American Communist Party has endorsed, approved and urged application to the American scene of these norms.

We fail to find in any of the documentary evidence produced by the Government or the defendant in this case their disavowal. On the contrary, throughout, there is identification of the American Communist Party with both the aims and the methods of achievement taught by the Soviet leaders and the Communist International. It is immaterial whether the forcible overthrow of the Government is "the immediate" or "the ultimate" aim in the United States.

31. M. J. Olgin, 1933, Why Communism, p. 75.

32. J. Peters, 1935, The Communist Party, A Manual on Organization, p. 8.

33. Stalin's Speeches on The American Communist Party, 1929, p. 17.

34. Alex Bittelman, The Communist Party in Action, 1932, p. 16.

For the statute we are interpreting makes no distinction between immediacy and futurity of such advocacy. It bars membership to *anyone* who belongs to an organization or group that "believes in, advises, advocates, or teaches" the proscribed doctrine.

## IV

### Concealment as Fraud

■ What precedes shows the nature of the Communist Party during the period under discussion. The documentary proof was confirmed by oral testimony as to what was taught officially at gatherings attended by the defendant and others. The defendant having helped distribute the type of literature we have analyzed and having otherwise participated actively in the affairs of the party, as an organizer and in other capacities, the evidence is sufficient to charge him with full knowledge of the methods it taught for attaining them by force and violence. More, there is nothing in the record showing *any disavowal* of these teachings *by the defendant at any time.* A person holding such views was not entitled to naturalization under the Nationality Act of 1940.[35] The concealment of active membership in such organization was a fraud on the Government for which citizenship must be revoked.[36]

■ The information which the defendant was required to furnish was important to the Government. Disclosure of membership in the Communist Party *would not have ipso facto* brought about immediate denial of citizenship. But it was a material fact which would have initiated an inquiry to determine (a) whether the Communist Party advocated the overthrow of the Government by force and violence or (b) whether its repudiation of the democratic process and ideals is such as to warrant the conclusion that one who espouses its doctrines *is not* "attached to the principles of the Constitution of the United States". The concealment in a naturalization proceeding of a material fact,—whether it bears on the character of the person [37] or relates to membership in a forbidden organization or to advocacy of views which are not consistent with attachment "to the principles of the Constitution (of the United States)" [38] is fraud.

Speaking of the dictatorship of the proletariat which is the aim of all modern day Communism and the need to break resistance to it by force, Lenin wrote:

"It is clear that where there is suppression there is also violence, there is no liberty, no democracy." [39]

It has already been shown that the American Communist Party, during the period under discussion, embraced not only all the aims, but also the methods used in Russia and advocated and defended by Lenin and Stalin, and the Communist International, *of which it declared itself a part.* One of the writers who was especially referred to as an American leader by Stalin in 1929 wrote:

---

35. See, Notes 3 and 4; United States v. Ginsberg, 1917, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853.

36. See cases in Note 2.

37. See, United States v. Ascher, 2 Cir., 1945, 147 F.2d 544; Del Guercio v. Pupko, 9 Cir., 1947, 160 F.2d 799; United States v. Shapiro, D.C.Cal., 1942, 43 F.Supp. 927; Stevens v. United States, 7 Cir., 1951, 190 F.2d 880; United States v. Corrado, D.C.Mich., 1953, 121 F.Supp. 75; United States v. Anastasio, D.C.N.J., 1954, 120 F. Supp. 435; United States v. Gelbert, D. C.Ill., 1954, 121 F.Supp. 414.

38. United States v. Chomiak, D.C.N.Y., 1952, 108 F.Supp. 527; United States v. Charnowola, D.C.Mich., 1953, 109 F. Supp. 810; United States v. Polites, D. C.Mich., 1953, 127 F.Supp. 768; United States v. Sweet, D.C.Mich., 1952, 106 F.Supp. 634. The judgments in these three cases were affirmed by the Court of Appeals for the Sixth Circuit in Sweet v. United States, 6 Cir., 1954, 211 F. 2d 118. See, Orth v. United States, 5 Cir., 1944, 142 F.2d 969; Allan v. United States, supra, Note 9; Weber v. United States, 9 Cir., 1941, 119 F.2d 932, 934; Tauchen v. Barber, 9 Cir., 1950, 183 F.2d 267, 268.

39. Lenin, State and Revolution, 1932, p. 72.

"Our Party is the United States Section of the Communist International which is a world Communist Party and each one of us is therefore a member of a world Party. In this lies the greatest hope and promise of success for the world's proletarian revolution and all oppressed and exploited in' their struggle against capitalism." [40]

And in the issue of "The Communist" of September 1939, devoted to the twenty years history of the Communist Party of the United States, *introduced in evidence by the defendant,* the same writer, *who was one of the editors,* characterized the development of the party in the United States in this manner:

"The two decades of our Party's life could be summed up as the history of building an American Marxist-Leninist party, orientated towards making it as good and influential a party as the Bolshevik Party of Lenin and Stalin." [41]

In the same issue another writer summed up the attitude of American Communism towards Soviet Communism in this manner:

"The people of America and other countries are beneficiaries of the achievements of the Russian Communards, who, in 1917, 'stormed the heavens', and who today have established a socialist society on one-sixth of the earth." [42]

These declarations imply not merely a *theoretical* approval of the aims of Communism as taught by Lenin and Stalin and as practiced in Russia, but *acceptance* of its anti-democratic technic and strategy by the American Communist Party.

■ One who embraces a totalitarianism which extolls the achievements of a party which attained its objective by violent revolution and civil war and which openly and avowedly repudiates democracy and liberty as we understand them cannot be said to be

"attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." [43]

## Conclusion

Dissent from accepted governmental principles in a manner which may

"collide with cherished American ideals does not necessarily prove want of devotion to the Nation." [44]

This is the spirit of America, as of every free society. We should be careful, in a proceeding for denaturalization, not to retroject into the past, pre-naturalization period, current and post-naturalization expressions of ideas which do not differ from those expressed by many native born Americans.[45] But when we are dealing with the qualifications which are conditions precedent to naturalization we should bear in mind that they,—residence, moral character and attachment to the principles of the Constitution,—are

"exacted because of what they promised for the future, rather than for what they told of the past." [46]

And if these qualifications do not exist, or the information which would lead to the discovery of their absence is concealed or evaded, there is "wrongful use of a beneficent law".[47]

40. Alexander Bittelman, The Communist Party in Action, 1932, p. 33.

41. The Communist, Vol. XVIII, No. 9, September, 1939, pp. 771, 782.

42. Alexander Trachtenberg, The Soviet Union and The American People, The Communist, supra, Note 41, p. 886.

43. Section 307 of the Nationality Act of 1940, Section 707 of Title 8 U.S.C., now embodied in Section 1427(a) (3) of Title 8 U.S.C.A.

44. Baumgartner v. United States, 1944, 322 U.S. 665, 674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525.

45. Meyer v. United States, 5 Cir., 1944, 141 F.2d 825, 826–828.

46. Luria v. United States, 1913, 231 U.S. 9, 23, 34 S.Ct. 10, 13, 58 L.Ed. 101.

47. Luria v. United States, supra, 231 U.S. at page 24, 34 S.Ct. at page 13.

■ American culture is the product of various national cultures. No one is required, as a condition of naturalization, to surrender the individual culture or heritage which he or his forebears brought to this country. For such heritage, in the main, is a part of western European culture, of which American culture is a branch and a continuation. There is richness in cultural diversity.[48] And we should tolerate variations in the cultural pattern although they involve a departure from some cherished ideals.[49] But the Congress of the United States has imposed certain conditions for naturalization, the nonexistence of which calls for its denial. Hence the concealment of facts which would have led to the discovery of the nonexistence of any of the prescribed conditions is fraud, for which naturalization once obtained must be revoked. This is especially true when the concealment relates to membership in an organization which advocates the forcible overthrow of Government.

Heirs to the English tradition, we eschew force as a means of achieving social change. The prevalence among certain radical elements of contrary doctrines in 1940 and before, led to the legislative proscription against naturalization of one who belongs to an organization or group advocating such forcible overthrow.

■ Ours is the task to apply judicially the conditions prescribed by the Congress. Because of the high worth of American citizenship and the severe implications of a judgment cancelling a naturalization certificate, there is imposed upon the Courts the burden of requiring that proof leading to revocation be "clear, unequivocal and convincing."[50]

The burden has been met in this case. The certificate of naturalization is ordered revoked.

48. Baumgartner v. United States, supra Note 44; Knauer v. United States, 1946, 328 U.S. 654, 659, 66 S.Ct. 1304, 90 L. Ed. 1500.

49. "If, in our more explicit and self-conscious moods, we tend to give the primacy to our Anglo-Saxon inheritance, it is because we identify this tradition with those ideals of liberalism and democracy which we rightly hold as paramount. The contribution of these diverse national and racial stocks to our common American life exemplifies the subordination of the past to the future, of origin to function, of the hold of mere tradition to the potentialities of freedom, liberation, and self-expression." (G. P. Adams and Others, Knowledge and Society, 1938, p. 387.)

50. See cases in Note 6.